941 A.2d 655

**COMMONWEALTH of Pennsylvania**

**v.**

**Willie COOPER, Appellant.**

**Commonwealth of Pennsylvania, Appellant**

**v.**

**Willie Cooper.**

Supreme Court of Pennsylvania.

Argued April 17, 2007.

Decided Dec. 28, 2007.

Mitchell S. Strutin, Philadelphia, for Willie Cooper, appellant.

Amy Zapp, Harrisburg; Hugh J. Burns, William Young, Philadelphia Dist. Attorney's Office, for the Com. of PA, appellee.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## OPINION

Justice FITZGERALD.

Appellant Willie Cooper was arrested on May 1, 2002, and charged with murder and related offenses in connection with the killing of Sherita House in Philadelphia.[1] The victim lived with her boyfriend, William Cooper, who is appellant's brother. The murder took place in the couple's apartment.

---

1. Both the Commonwealth and Willie Cooper, defendant below, appeal from the trial court's orders. For clarity's sake, we refer to Cooper as appellant throughout this Opinion.

The Honorable Jane Cutler Greenspan, Philadelphia Court of Common Pleas, presided over appellant's jury trial. On October 1, 2003, the jury found appellant guilty of First Degree Murder (18 Pa.C.S. § 2502(a)), Robbery (18 Pa.C.S. § 3701(a)), and Burglary (18 Pa.C.S. § 3502(a)). On October 3, 2003, following a penalty phase hearing, the jury returned a sentence of death, finding one aggravating circumstance (a killing committed while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6)), and no mitigating circumstances. The trial court imposed additional, consecutive prison terms of nine to twenty years for robbery and five to twenty years for burglary.

New counsel filed post-sentence motions on a variety of grounds, including ineffective assistance of trial and mitigation counsel. The trial court held two days of hearings on the motions in April 2004, after which it denied appellant's requests for an arrest of judgment or new trial, but granted appellant's motion for a new penalty hearing. The court concluded that mitigation counsel had rendered ineffective assistance during his closing argument.[2]

The Commonwealth appealed the trial court's order granting a new penalty phase hearing and appellant likewise filed an appeal in which he challenged the trial court's denial of relief on all other claims set forth in his post-sentence motions. For the reasons that follow, we affirm the trial court's orders granting a new penalty hearing and denying all other claims.

In all instances in which the death penalty is imposed, this Court begins its review with an inquiry into the sufficiency of the evidence to support first-degree murder. *Commonwealth v. Davido,* 582 Pa. 52, 868 A.2d 431, 435 (2005). This case presents a slightly different procedural posture. Although the jury imposed a death sentence in this case, the trial court vacated that penalty and the Commonwealth has appealed the court's decision. Thus, we have before us a case in which the death penalty was imposed and then vacated, with the Commonwealth requesting that we re-impose the death sentence.

---

**2.** On June 30, 2004, the trial court modified its order to clarify that it did not vacate the defendant's sentences for robbery and burglary.

In prior cases that involved collateral review, we have characterized matters in which a lower court vacated the death sentence as ones "in which the death penalty has been imposed," thus triggering our review of all issues properly preserved on appeal. *Commonwealth v. Bryant*, 566 Pa. 307, 780 A.2d 646, 648 (2001) (citation omitted) (holding death sentence need not be pending in order for this Court to engage in review of issues on appeal). *See also Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 568 (2005) (holding guilt phase issues shall be resolved by this Court even if death sentence has been vacated by trial court on collateral review).

This case is before us on direct appeal following the jury's imposition of the death penalty and the trial court's examination and resolution of multiple guilt phase and penalty phase issues. We have the benefit of a complete record. Accordingly, we begin with a factual summary to facilitate our sufficiency review and thereafter address all relevant and preserved claims of the parties on appeal.

## SUMMARY OF FACTS

The evidence at trial revealed the following facts. On February 3, 2002, at 1:27 a.m., police officers responded to a report of burglary in progress at the Emperian Towers apartment building in the Germantown section of Philadelphia. Upon arrival they met William Cooper, appellant's brother, who took the officers to his apartment. When first entering the apartment, the officers found the entryway closet open and its contents disturbed. Inside, the officers discovered Ms. House lying face-down in the hallway. There were no apparent signs of forced entry and no indications of a struggle. Nothing of value appeared to be missing and only a sofa cushion had been disturbed. The victim's pocketbook was on a couch and a diamond ring and credit card were lying on the floor. The victim had not been sexually assaulted.

An autopsy indicated that Ms. House had been strangled to death. The medical examiner testified that there were no signs of a defensive struggle. A mark on her forehead was

consistent with a fall to a carpeted surface. The medical examiner likened his findings in this case to other post mortems where large men were quickly subdued by a strangulation attack from behind.

William Cooper and Sherita House had been dating for over a year and Ms. House was three and one-half months pregnant with William's child at the time of her death. According to William, appellant had stayed at the couple's apartment for two nights prior to the killing. Appellant was a temporary guest, who did not possess a key to the apartment, or a security card to the building. However, appellant was aware of a side exit-door which typically was propped open by those using it to leave and then reenter the building. On the afternoon of the murder, Ms. House was getting ready for her 4:00 p.m. shift at Boscov's department store. William and appellant left the apartment at about 2:30 p.m., as Ms. House was preparing for work. The brothers intended to take a train into Center City Philadelphia. They used the side exit-door when leaving the apartment complex on their way to the train station.

When the train arrived, William began to board the train, but appellant did not. Appellant explained to William that he had changed his mind, and had decided to catch a bus to his former girlfriend's house in order to visit his child. William got on the train and appellant walked away from the station. William's cellular phone records for the afternoon and evening substantiated his account of his activities that day.

Following the discovery of the victim and as the criminal investigation progressed, police sought to interview appellant. Detectives went to the home where appellant had been living with his girlfriend, but before they could speak to him, he jumped out a back window and fled. For the next twelve days, police attempted to locate appellant, without success, and appellant made no attempt to contact detectives. On February 18, 2002, armed with a search warrant, detectives went back to the same house, found appellant, and transported him to police headquarters for an interview.

Once in custody, appellant told police that after William boarded the train, he went to a doughnut shop several blocks and several bus stops away from the train station. He then took a bus to his former girlfriend's house, arriving there at about 4:30 or 4:45 p.m. A detective retraced appellant's purported route at the same time and day of the week, finding that it took 45 minutes to arrive at the girlfriend's house, leaving a period of at least an hour when appellant's whereabouts were unknown. Ms. Danine Cox, appellant's former girlfriend and the mother of his child, testified that appellant arrived at her home at about 4:00 p.m. that Saturday afternoon. Earlier, she told police that appellant could have arrived after 4:00 p.m.

On February 26, 2002, William Cooper began to cooperate more fully with police. He admitted that he had been selling marijuana, and had purchased a pound of marijuana the evening prior to Ms. House's death. William explained that appellant was with him when he bought the drugs. Appellant saw William place the marijuana in a "City Blue" bag, hide the bag in the closet by the front door, and place appellant's red and black gym bag on top of the drugs in the closet. William also hid his gun, a .380 semi-automatic, beneath the sofa cushion, while appellant was present that night.

Upon receiving this information from William, police went to the home where appellant lived and interviewed Christina Shaird, the mother of appellant's girlfriend. Ms. Shaird told police that in the days following the murder she had seen appellant with a "City Blue" bag containing marijuana and also had observed a black and red gym bag with a "lot of weed" in it, beneath Willie's bed. Ms. Shaird's son, Antwan, who also lived at the residence, sold marijuana for appellant and had been arrested for drug sales shortly after Ms. House's murder. During this same time period, Ms. Shaird's other son, Dwaine, observed Antwan return marijuana to appellant and saw that appellant possessed a gray, dark colored gun with a clip. Antwan also saw appellant with a gun at that time; he described the weapon as a green and brown automatic, with a nine round clip. Ms. Shaird consented to a

search of her home, where police retrieved a black gym bag with red trim from a closet. No drugs were found in the bag, but a canine sniff test resulted in a positive indication for illegal drugs.

At trial, appellant defended the matter by placing blame for the murder on his brother William. Several defense witnesses testified that William and Ms. House had been in a violent relationship, that Ms. House had shown them burn marks and bruises on her body some months earlier, and that she had said she intended to leave William. Appellant also suggested that perhaps the murder had been committed by William's rivals in the drug trade. The jury rejected both defense theories and accepted the Commonwealth's version of events, finding appellant guilty of all charges.

## SUFFICIENCY OF EVIDENCE FOR
## FIRST DEGREE MURDER

Our standard of review for sufficiency is clear. We must determine whether the evidence admitted at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 840 (2003). In making this determination, we consider both direct and circumstantial evidence, cognizant that circumstantial evidence alone can be sufficient to prove every element of an offense. *Commonwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902, 906 (1991). We may not substitute our own judgment for the jury's, as it is the fact finder's province to weigh the evidence, determine the credibility of witnesses, and believe all, part, or none of the evidence submitted. *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 501 (1997).

Evidence is sufficient to sustain a conviction of first-degree murder where the Commonwealth establishes that a human being was unlawfully killed, that the person accused did the killing, and that the accused acted with a specific intent to kill. *Commonwealth v. May*, 584 Pa. 640, 887 A.2d

750, 753 (2005). An intentional killing is one that is willful, deliberate, and premeditated. 18 Pa.C.S. § 2502(d).

■ Viewing the evidence in the light most favorable to the Commonwealth, we conclude with certainty that it was sufficient to support the verdict of first-degree murder. First, the evidence of Ms. House's death by manual strangulation was sufficient to establish that the perpetrator acted maliciously and with a specific intent to kill. *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621, 629 (1995). Further, all of the other evidence recited above, albeit primarily circumstantial, was sufficient to establish beyond a reasonable doubt that appellant committed the murder. The evidence reasonably and logically leads to the conclusion that once appellant was assured that his brother was on a train to center city, he returned to his brother's apartment, stole the drugs and gun, and in the process of doing so, killed Ms. House.

Having determined that the evidence supports the conviction for first-degree murder, we turn to the issues raised by the parties. The Commonwealth raises the sole claim that the trial court erred in granting appellant a new penalty hearing. Appellant, in turn, claims that he is entitled to a new trial on a variety of grounds and, further, that there are a number of additional bases upon which he was entitled to a new penalty hearing. Appellant's claims are as follows:

I. The evidence was insufficient to sustain the conviction for burglary.

II. The trial court erred in prohibiting admission of the victim's statements to her friends that William Cooper was responsible for inflicting bruises and burn marks on her body.

III. Trial counsel was ineffective for failing to object to the prosecutor's guilt phase summation, wherein he stated that the murder did not involve domestic violence.

IV. Trial counsel was ineffective for failing to object to the trial court's charge on burglary, concerning revocation of permission to enter the premises.

V. (a) The trial court erred in dismissing prospective jurors who answered affirmatively to death penalty or life qualification questions; (b) Trial counsel was ineffective for failing to object to the dismissal of jurors in absence of individual voir dire, and for failing to conduct individual voir dire of the remaining prospective jurors regarding the death penalty and life qualification.

VI. Trial counsel was ineffective for failing to timely object to the prosecutor's references to the Bible during his penalty phase summation.

VII. Trial counsel was ineffective for failing to timely object to the prosecutor's remarks in his penalty phase summation concerning the defendant's failure to show remorse.

VIII. The prosecutor committed misconduct in his penalty phase summation when he suggested that the defendant may escape if he is sentenced to life.

IX. Trial counsel was ineffective for failing to present crucial evidence of the defendant's character, history, and condition at the penalty phase hearing.

## COMMONWEALTH'S CLAIM ON APPEAL

The trial court granted appellant's post-sentence request for a new penalty hearing based on a finding that mitigation counsel was ineffective for making biblical references to the jury that in effect sanctioned the imposition of the death penalty. Counsel told the jury that while most people were familiar with the biblical phrase "an eye for an eye," not many knew that the Bible reserved this severe punishment for a very narrow type of wrongdoing, that is, where a person kills a pregnant woman. Despite the fact that this case involved that very scenario, mitigation counsel told the jury:

> When you go back there, someone may say, as the District Attorney referred: You must impose the death penalty because of an eye for an eye, and a tooth for a tooth, and if that happens, I will ask you to ... request that a Bible be sent back to you, and when you get that Bible, turn to the book of Exodus, Chapter 21, Verse 24, and you will see

those very words: An eye for an eye, and a tooth for a tooth. And at that moment in time, you will think that you know what it means, but you won't, because in order to know what it means, you have to read verse 22 and 23 in front of it, which says that if there is an assault on a woman, and that woman is pregnant, and that woman loses the child, and there is damage beyond that to the woman, then an eye for an eye and a tooth for a tooth. You may go back there, and you may think that you have to impose the death penalty in this case because that is the worst thing that anyone can ever do to anyone else.

N.T. 10/2/03 at 82–83; Trial Court Opinion, July 21, 2004, at 13 n. 4. Shortly after penalty deliberations began, the jury asked the trial judge for the Bible. The trial court refused, explaining, "[I]t would be inappropriate for me to give you a copy of the Bible." N.T. 10/3/03 at 3.

At the post-sentence evidentiary hearing on appellant's claim of ineffectiveness in connection with this incident, counsel testified that he knew that a prosecutor is precluded from referring to the Bible, but he did not believe the same rule applied to defense counsel. The trial court found credible counsel's testimony that despite his awareness of the victim's pregnancy, he had made the biblical argument out of habit, as he frequently used the argument as a basis for encouraging a jury's rejection of the death penalty. The trial court specifically found counsel's comments to be accidental and not intended as an effort to build prejudicial error into the proceedings. Trial Court Opinion at 15. Concluding that all prongs of ineffective assistance of counsel had been met, the trial court vacated the death sentence and granted appellant a new penalty hearing.

■■ To prevail on an ineffective assistance of counsel claim, the defendant bears the burden of establishing: 1) an underlying claim of arguable merit; 2) no reasonable basis for counsel's act or omission; and 3) prejudice as a result, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different. *Commonwealth v. Carpenter*, 555 Pa. 434, 725 A.2d 154, 161

(1999). Counsel is presumed to have been effective. *Commonwealth v. Balodis*, 560 Pa. 567, 747 A.2d 341, 343 (2000). A failure to satisfy any prong of this test is fatal to the ineffectiveness claim. *Commonwealth v. Sneed*, 587 Pa. 318, 899 A.2d 1067, 1076 (2006).

The right to effective assistance of counsel extends to closing arguments, the purpose of which is to "sharpen and clarify" the issues presented to the trier of fact. *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 742 (2004) (quoting from *Yarborough v. Gentry*, 540 U.S. 1, 5–6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003)). Because of the broad range of legitimate defense strategies at this stage of the proceeding, great deference is accorded counsel's tactical decisions in his closing presentation. *Yarborough, supra.* A misstatement by counsel when referring to evidence does not necessarily demand relief, particularly because the jury is instructed that the arguments of counsel are not evidence. *Bryant, supra* at 745. Although we do not disregard completely the reasonableness of other alternatives available to counsel, "the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis." *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987) (citation omitted).

In *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991), this Court held that it is *per se* reversible error for the prosecutor to rely on the Bible or any other religious writing in support of the death penalty. *Id.* at 644. We explained that a jury should consider only factors which flow from the evidence and the inferences properly drawn from the evidence. *Id.* Reliance on the Bible or other religious writing encourages the jury to substitute religious precepts for the law of this Commonwealth, only the latter of which the jury is required to follow. *Id.*

Our Legislature has determined that the death penalty is an appropriate punishment for certain intentional killings, and by statute sets forth specific sentencing procedures that control the manner in which the death penalty may be imposed. 42

Pa.C.S. § 9711. The relevant law provides for a separate penalty phase hearing, whereby the parties offer evidence relevant to punishment, and counsel has the opportunity to present argument. 42 Pa.C.S. § 9711(a)(2), (3). Defense counsel is permitted wide latitude in presenting evidence of mitigating factors to the jury, including a factor counsel argued in this case, that is, "any ... evidence ... concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8).

■ We have not hesitated to find that religious references are improper and irrelevant when intended to persuade jurors to follow their religious beliefs, as opposed to the law of this Commonwealth. *See Chambers*, 599 A.2d at 644. We defer to the Legislature's carefully defined and limited circumstances under which a sentence of death may be imposed. Jurors have an obligation to apply the law, and may not ignore their oath and obligations by substituting their own religious beliefs. Accordingly, in *Commonwealth v. Daniels*, 537 Pa. 464, 644 A.2d 1175, 1183 (1994), we upheld the trial court's proper restrictions of defense counsel's references to the Bible in support of his argument that the death penalty is morally wrong. This Court noted that the same considerations which prohibit a prosecutor from relying on the Bible to support imposition of the death penalty should apply to defense counsel's use of the Bible to oppose the death penalty: "The boundaries of proper advocacy are exceeded if we allow counsel to make arguments calculated to inflame the passions or prejudices of the jury, or to divert the jury from its duty to decide the case on the evidence by introducing broad social issues that are not based on evidence in the record." *Id.* at 1183.

The Commonwealth argues that because the jury found the existence of one aggravating circumstance and no mitigating circumstances, the jury did not have to engage in a weighing process, and therefore could not have been affected by defense counsel's remarks about the Bible. Relying on several decisions of this Court in which we upheld the imposition of the

death penalty, the Commonwealth argues that appellant simply cannot prove prejudice as a matter of law.

The Commonwealth draws our attention to *Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334 (1987), wherein this Court acknowledged as improper a prosecutor's remark that the jury should impose death in order to send a message to a judge who had given a lenient sentence to the same defendant in a prior case. *Id.* at 344. We concluded in *Crawley* that, despite the prejudicial nature of the remark, the fact that the jury found a single aggravating circumstance and no mitigating circumstances meant that there was no weighing process in which the jurors may have been adversely affected by the prosecutor's comments. *Id.* at 344–45. We reached a similar conclusion in *Commonwealth v. Beasley*, 524 Pa. 34, 568 A.2d 1235 (1990), when we considered whether to affirm a death sentence following the prosecutor's remark about the defendant's previous criminal conviction. *Id.* at 1237. And in *Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613 (1991), we relied on the same rationale in rejecting the defendant's claim that he was prejudiced by his counsel's statement about how long he might serve if given life imprisonment instead of death. *Id.* at 623.

We note that none of the cases the Commonwealth points to involve references to the Bible, an issue this Court has accorded careful treatment in the past. Further, and much more importantly, the cases simply do not involve the egregious and bizarre circumstances present in this case. Here, defense counsel, honestly and unwittingly, presented the jury with a compelling and independent basis for imposing the death penalty on his own client. Essentially, defense counsel's statements contradicted, indeed invalidated, his argument in support of mitigation, wherein he requested jury consideration of the "character and record of the defendant *and the circumstances of his offense.*" 42 Pa.C.S. § 9711(e)(8) (emphasis added). None of the cases summarized above involved these unique circumstances and so we conclude that they do not control.

Applying the standard for ineffectiveness claims to this issue, we conclude first that there is arguable merit to appellant's claim that defense counsel's reference was improper. This is so not just because it was a biblical reference, *see Daniels*, 644 A.2d at 1183, but because it encouraged the jury to impose the death penalty under the particular circumstances of this case: counsel argued against his client's interests. Second, we can think of no reasonable strategy counsel sought to employ by this reference. The trial judge, who heard counsel's testimony at the evidentiary hearing, specifically found that counsel's statements were inadvertent and accidental. Third, it is inconceivable to suggest that the statement had no effect on the jury. Upon retiring to deliberate, the jurors immediately requested that the court provide them with a Bible.

The trial court concluded that prejudice was established and we find no error in that conclusion. The record supports the trial court's finding that, but for counsel's encouragement to the jury that the Bible mandated the death penalty in this particular case, the result of the hearing may well have been different. The Pennsylvania Sentencing Code provides that this Court shall affirm the sentence of death unless it determines that the sentence "was the product of passion, prejudice or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3)(i). Counsel's biblical reference likely aroused those very factors in this case. As a result, we will affirm the trial court's grant of a new penalty hearing.

### APPELLANT'S CLAIMS ON APPEAL

 Appellant first asserts that the evidence at trial was insufficient to sustain his conviction for burglary. Specifically, appellant claims that the Commonwealth failed to prove beyond a reasonable doubt that he was not licensed or privileged to enter the premises. "A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter." 18

Pa.C.S. § 3502(a). Thus, to prevail on a burglary charge, the Commonwealth is required to prove beyond a reasonable doubt that the offender entered the premises, with the contemporaneous intent of committing a crime, at a time when he was not licensed or privileged to enter. *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699, 704 (1989). However, a license or privilege to enter a premises is negated in the event it is acquired by deception. *Commonwealth v. Edwards*, 588 Pa. 151, 903 A.2d 1139, 1148 (2006). In *Edwards*, the defendant went to the victim's home, claiming to have money to settle a drug debt. *Id.* at 1144. However, the defendant's real purpose was to gain entry into the residence in order to kill the victim. *Id.* On appeal, the defendant argued that the evidence was insufficient to establish burglary because the victim permitted him entry into the premises. This Court rejected the defendant's claim, explaining that the deceptive nature of the entry negated any license or privilege to enter. *Id.* at 1148.

The Commonwealth's burglary theory in this case was similar to that presented in *Edwards*. The prosecutor suggested that appellant gained entry into his brother's apartment by deceiving the victim. The evidence at trial, when viewed as it must be in the light most favorable to the Commonwealth as verdict winner, supported this conclusion. Although the evidence of deception was primarily circumstantial here, it was no less valid than that in *Edwards*, nor any less compelling.

Despite plans to accompany his brother to Center City on the afternoon of the murder, appellant left William at the last moment, as William boarded the train. Appellant then returned to the apartment complex, where he knew that a propped-open door would give him access to the building. Appellant did not have a key to the apartment and was no longer a guest there. Nonetheless, appellant gained access to the apartment. There was no sign of forced entry and no sign of struggle inside. Appellant stole the marijuana and firearm he knew were hidden there. In addition, he strangled the

victim to death, by some manner of surprise, most likely from behind.

All of these facts lead to the reasonable inference that the victim granted appellant access to the apartment for some seemingly legitimate reason, when in fact appellant entered so that he could accomplish the theft. In light of our standard of review, we conclude that the evidence supported the Commonwealth's theory of deceptive entry. Under *Edwards*, appellant's claim fails.

 Appellant next claims that he is entitled to a new trial based on the trial court's error in excluding proffered defense testimony. At trial, appellant's theory of the case was that his brother William committed the murder. To that end, appellant offered testimony from Ms. House's co-workers regarding the couple's volatile relationship. The trial court permitted these witnesses to testify that they saw bruises and burn marks on the victim's body some months before the murder. However, the court did not permit the witnesses to testify that the victim told them William was responsible for the injuries, ruling that such statements were hearsay, to which no exception applied.

 Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406, 414 (1999). Not merely an error in judgment, an abuse of discretion occurs when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record." *Commonwealth v. McAleer*, 561 Pa. 129, 748 A.2d 670 (2000) (citation omitted).

Appellant argues that among other cases, our decisions in *Commonwealth v. Myers*, 530 Pa. 396, 609 A.2d 162 (1992) and *Commonwealth v. McGowan*, 535 Pa. 292, 635 A.2d 113 (1993), mandate admission of the victim's statements to her co-workers. Relying on *Myers*, appellant claims that the victim's statements were admissible to establish William's ill will,

motive, or malice. Under *McGowan*, appellant asserts, the evidence was admissible in order to establish that someone else was responsible for the victim's death. While appellant's development of this claim is less than adequate, we note that *Myers* and *McGowan* may be interpreted to establish that the evidence at issue was relevant to his defense. We observe, however, that even if we assume that the evidence should have been admitted, we would conclude that its exclusion was harmless here. The record reflects that defense counsel was successful in presenting to the jury evidence of William's physically abusive relationship with the victim. The jury heard testimony from her co-workers, and defense counsel engaged in zealous cross-examination of William at trial. Further, and perhaps most important, the prosecution conceded this aspect of the couple's relationship in his closing argument. Thus, the jury was aware that the couple's relationship was a stormy one, and that William abused the victim some months prior to her murder. For these reasons, appellant is not entitled to relief on this claim.

 Appellant next claims that he is entitled to a new trial based on trial counsel's ineffectiveness in failing to object to the prosecutor's closing statement at the guilt phase. Specifically, appellant challenges the prosecutor's improper "expert opinion" that the evidence at the murder scene did not comport with a domestic violence killing.[3]

 A prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury. *Commonwealth v. Abu-Jamal*, 553 Pa. 485, 720 A.2d 79, 110 (1998). A challenged statement by a prosecutor must be evaluated in the context in which it was made. *Commonwealth v. Hall*, 549 Pa. 269, 701

3. This claim of ineffective assistance of counsel is reviewable on direct appeal despite the rule that ineffectiveness claims ordinarily should await collateral review. *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). Here, appellant presented the claim to the trial court on post-sentence motions and the court considered and resolved the issue on the merits. Thus, the claim fits the narrow exception to *Grant* set out in *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 855 (2003).

A.2d 190, 198 (1997). Not every intemperate or improper remark mandates the granting of a new trial. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975). Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict. *Commonwealth v. Cox*, 556 Pa. 368, 728 A.2d 923, 931 (1999).

One of the defense strategies in this case was to place blame for the murder on William. Defense counsel's cross-examination of William focused on the couple's many arguments and, as noted above, counsel presented testimony by Ms. House's co-workers to establish that William physically abused her in the past. In his closing argument to the jury, defense counsel suggested that William, an initial suspect who had provided varying statements to the police, committed the murder. Counsel argued that when William discovered the burglary, he showed little concern for the victim's welfare, even though she was supposed to have been home at the time.

The prosecutor countered these arguments by reminding the jury that the crime scene belied appellant's theory in that there was no evidence of a quarrel or fight, no indication that the victim suffered additional injuries, and no proof that she had struggled with her attacker. Had William killed the victim in a domestic rage, the prosecutor argued, the forensic and physical evidence at the crime scene would have been far different.[4]

---

4. The prosecutor made the following remarks: "Think about it this way: William Cooper is the boyfriend, who is going to kill Sherita House, who is the girlfriend. That is called a domestic type.... I submit to you that the killing of Sherita House, the way that she was murdered, where it took place, the manner in which it occurred, is not indicative of a domestic murder. You don't have to be expert, I submit, in the field, if you will, because every juror is permitted to use their common sense, their intellect, their wisdom, their human experiences, and their knowledge of human behavior, and you can apply that to the facts of this case, and any of you people-and I'm sure that all of you people have heard numerous situations, or seen them on TV, or read about them, of domestic murders. I submit to you that a domestic murder-I assume that they are trying to get you to believe that in order to take the heat off Willie, and take the focus off him, and put it on his

The trial court concluded that the prosecutor offered a fair response to defense counsel's arguments and merely asked the jurors to "use their common sense, wisdom, experience, and knowledge of human nature" to reject appellant's version of events. Trial Court Opinion at 12. As a result, the trial court concluded, there was no underlying merit to appellant's claim and there could be no ineffectiveness. Upon review of the record as a whole, we agree.

The prosecutor was entitled to mount an argument, based only on the evidence of record, as to why the defense theory was not worthy of belief. The prosecutor's comments on the lack of evidence of a violent struggle and the type and amount of injuries the victim suffered were nothing more than a recitation of the evidence presented at trial.[5] His appeal to the jurors to use their common sense in assessing the evidence and evaluating the merit of appellant's theory was proper. Because the remarks complained of did not rise to the level of prosecutorial misconduct, defense counsel cannot be deemed ineffective for failing to raise an objection. *Commonwealth v. Whitney*, 550 Pa. 618, 708 A.2d 471 (1998).

> brother, William, but it doesn't fit what happened to Sherita. The domestic type of murder is almost like a script. It is orchestrated like a dance. It starts with words, yelling, screaming, taunting, cursing, and putting the person down. That turns into a shove; it turns into a push; it turns into a kick; it turns into a stomp; it turns into a beating; and the woman invariably is beaten, and bruised and battered, because that's part of the psychology of an abuser. It wouldn't be good enough to just come up behind her, catch her unaware, off guard, put your fingers around her neck, and strangle her to death, because the abuser would want to humiliate her, would want to see fear, would want to subject her to his will. In a domestic murder, there are loud voices, yelling, screaming, things getting thrown, things getting broken, things getting pulled apart, people getting hit, people getting punched, people getting stomped. There is bruising and battering, and then the killing. This is not what happened to Sherita House. Nobody heard a thing inside that apartment, because it happened quietly. It happened quickly. She was caught off guard and unaware. That type of murder is not consistent with someone like William Cooper killing his own girlfriend." Trial Court Opinion at 10–11.

5. Appellant relies on *Commonwealth v. Bolden* 227 Pa.Super. 458, 323 A.2d 797 (1974), but his reliance is misplaced. *Bolden* dealt with a prosecutor's improper and prejudicial comments to the jury that "there are certain things that I cannot tell you referring to this case." *Id.* at 798.

Appellant's next claim is that trial counsel was ineffective for not objecting to the trial court's jury instruction on burglary. The challenged charge was as follows:

Now, jurors, permission to enter a place or premises initially given by the owner may, however, be vitiated or rendered ineffective if deception, trickery, or artifice was used on the part of the defendant in order to gain entry into the place or premises, but this is true only if you find, beyond a reasonable doubt, that trickery or subterfuge was used to gain such entry.

N.T. 10/1/03 at 40–41.

When reviewing a challenge to a part of a jury instruction, we consider the charge in its entirety to determine if it is fair and complete; a verdict will not be set aside if the instructions, taken as a whole and in context, accurately set forth the applicable law. *Commonwealth v. Bracey*, 541 Pa. 322, 662 A.2d 1062, 1068 (1995).

With respect to the three-prong standard appellant must satisfy to establish ineffectiveness, we note that his claim fails at prong one. Simply put, the judge's charge to the jury was correct. As indicated by our discussion of *Edwards* and *Thomas* set out above, license or privilege to enter a premises indeed may be negated in the event such permission is acquired by deception. Thus, there is no merit to appellant's underlying claim, which is fatal to his allegation of ineffective assistance of counsel.[6]

Appellant's remaining claims all concern trial court errors or ineffective assistance of counsel in connection with his

**6.** Further, even if the claim had merit, we nonetheless would conclude that appellant failed to meet the second prong of ineffectiveness. At the evidentiary hearing on this issue, defense counsel testified that he did not object to the charge after it was given because he believed it was appropriate under the Commonwealth's theory of the case. N.T. 4/8/04 at 15–16. More importantly, counsel explained that the charge perhaps would be helpful to the defense, in that it required the jury to find beyond a reasonable doubt that appellant used trickery or subterfuge to gain entry. Where counsel employs a reasonable strategy designed to advance his client's interests, he will be deemed effective. *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994).

initial death sentence. Appellant's claims fall into three distinct categories: 1) the manner of selection of a death-qualified jury; 2) counsel's failure to object to the prosecutor's closing statement at the penalty phase; and 3) counsel's failure to present certain mitigation evidence. Like the trial court, we conclude that review of these claims is unwarranted because appellant's death sentence has been vacated. *See Commonwealth v. Boxley*, 575 Pa. 611, 838 A.2d 608, 614 (2003) (inadequacy of voir dire for death qualification purposes implicates only penalty phase issues); *Commonwealth v. Moore*, 580 Pa. 279, 860 A.2d 88, 100 (2004) (where defendant is granted a new penalty hearing, all remaining penalty phase issues are moot). The trial court has ordered a new penalty hearing, and we have affirmed that order, rendering moot any further review of penalty phase issues.

For the reasons stated herein, we affirm the trial court's order denying appellant relief on his guilt phase issues and granting relief on his penalty phase issue. Accordingly, this matter is remanded for a new penalty phase hearing.

Order affirmed. Jurisdiction relinquished.

Chief Justice CAPPY, Justices SAYLOR, EAKIN and BAER and Justice BALDWIN join the opinion.

Justice CASTILLE files a concurring opinion.

Justice CASTILLE, concurring.

I join the Majority Opinion. I write separately to the two points I address below.

First, I reiterate the view I expressed recently in my Concurring Opinion in *Commonwealth v. Rega*, 933 A.2d 997, 1032 (Pa.2007) (Castille, J., concurring, joined by Saylor, J.) that, absent waiver of PCRA rights, defendants generally should not be permitted to expand post-verdict motions and direct appeal to encompass collateral claims. *See also id.* at 1029 (Cappy, C.J., concurring) (sharing my concerns in this area).

Second, with respect to the trial judge's basis for granting penalty-phase relief, I agree that mitigation counsel's invitation to the jury to substitute the Bible for the Sentencing Code was improper and lacked a reasonable basis. The very purpose of such an improper invitation is to prejudice the opposition by introducing an irrelevancy as if it were a proper penalty argument.[1] Such attempts to circumvent the statutorily mandated sentencing scheme should be disapproved in the strongest terms. Nevertheless, the fact that the attempt here was pitifully botched does not prove that, had the argument not been made, the jury probably would not have returned the death penalty. In my judgment, it is a very close question whether any actual prejudice arose from counsel's improper invitation. The Majority concludes that "it is inconceivable to suggest that the statement had no effect on the jury" because, upon deliberation, the jurors immediately requested that the trial judge provide them with a Bible. Majority Op. at 666. The trial judge, however, just as promptly denied the request, telling the jurors that doing so would be "inappropriate" and reminding them that they must "decide the penalty based on the facts as you find them, and the law as I gave it to you." Notes of Testimony, 10/3/03, at 3. Moreover, the jury in this case found no mitigating circumstances and a single aggravating circumstance (that appellant committed the killing while in the perpetration of a felony), and the botched improper argument had nothing to do with that aggravating circumstance.[2] Counsel's improper "eye for an eye" biblical reference was irrelevant and, being irrelevant, it is hard to see specific prejudice.

Nevertheless, the prejudice assessment was made by the trial judge and therefore deserves a certain degree of defer-

1. It is beyond cavil that, had it been offered by the Commonwealth, such an argument would constitute prosecutorial misconduct. Trial judges should not permit the defense any more latitude with respect to such references to extra-statutory sources of law in a capital case.

2. As the victim was only three and one-half months pregnant at the time of her death, the Commonwealth did not present her pregnancy as an aggravating circumstance. See 42 Pa.C.S. § 9711(d)(17) ("At the time of the killing the victim was in her third trimester of pregnancy or the defendant had knowledge of the victim's pregnancy.").

ence. That fact, together with the supervisory concern I have articulated above, leads me to join in the Majority's affirmance of the grant of a new penalty hearing.