J-S33026-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JEFFREY PALMER | : | |
| | : | |
| Appellant | : | No. 2738 EDA 2019 |

Appeal from the PCRA Order Entered August 29, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002288-2015

BEFORE:   DUBOW, J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MURRAY, J.:                    **FILED SEPTEMBER 14, 2020**

Jeffrey Palmer (Appellant) appeals from the order dismissing his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

A prior panel of this Court summarized the facts and procedural history:

> On July 19, 2014, residents of the 6000 block of North Beechwood Street held a block party.  At around 11 p.m., while the party was winding down, Malik Hairston heard several men yelling, 'where gray tank top at?'  Around the same, [*sic*] Octavious Thornton, also known as 'Ta,' wearing a gray tank top, was outside his mother's house at [the] 6088 block of North Beechwood Street.  While Thornton was moving tables and chairs from the party into the house, a group of men approached.  One of the men said, 'let me holler at you,' in which Thornton replied, 'I don't know you from a can of paint.'  Another male in the group asked Thornton, 'What's up? What's up?'  Then a man in a

_____

* Former Justice specially assigned to the Superior Court.

red polo shirt advised Thornton, 'It's just a yes or no question.' As Thornton walked away and made his way into the house, the group of men grabbed him from the porch steps, and began punching him. More men soon gathered, and up to ten or twelve men punched Thornton and pulled him into the street. Thornton placed his back against a car and covered his body with his arms to protect himself from the barrage of punches.

Thornton's mother, sister (Daria), and Hairston, attempted to intervene. After Hairston struck one man, and pulled him off Thornton, the group of men attacked Hairston. Hairston grabbed a rake and swung it at some of the attacking men. After Hairston swung the rake, a voice among the attacking men yelled, 'Shoot that n*gger.' Immediately thereafter, gunshots rang out. To avoid being shot, Hairston ran into the house at [the] 6088 block of North Beechwood through the front door. He was the only person who fled into the house. After firing the shots, the shooter jumped into a gray vehicle and drove off.

Thornton told police that the shooter had a revolver, and described him as a black male, dark skin, 25 years old, wearing a red polo shirt, approximately 5' 6" to 5' 8", with a stocky build. Thornton's sister Daria also stated that the shooter wore a red shirt. She further testified that no one else involved in the fight had a red shirt on. Following the shooting, both Thornton and Hairston identified [Appellant] from a photographic array as the male in the red polo shirt.

Almost immediately following the shooting, at or around 11:20 p.m., Police Officer James Butler saw a silver vehicle speeding southbound on Ogontz Avenue, about six to eight blocks from the shooting on Beechwood. Officer Butler and Officer Mark Austin attempted to pursue the vehicle, but lost sight of it.

Not long after Officer Butler first spotted the speeding vehicle on Ogontz Avenue, a security guard at Albert Einstein Hospital—just a few blocks from Ogontz Avenue—heard tires screeching and witnessed a gray

vehicle speeding up the hospital's emergency entrance. After the vehicle appeared to hit a guardrail, the passenger side window lowered, and the vehicle backed up and drove off. When a security guard inspected the guardrail for damage, he saw a gun lying nearby in the grass.

Roughly a minute after losing sight of the vehicle on Ogontz Avenue, Offices Butler and Austin responded to Einstein Hospital for a report of a gunshot victim, later identified as Thomas Fields, who had just arrived. Fields was pronounced dead at 11:40 p.m. The cause of death was a gunshot wound to the neck and the manner of death was homicide. A bullet entered the right side, upper back, near the neck. It traveled through the neck, striking the cervical spine, and perforated the right vertebral arteries, which provide blood to the brain. The bullet exited the front of the neck.

Upon their arrival at the hospital, Officers Butler and Austin noticed the same vehicle that they had just observed speeding on Ogontz parked in front of the ER. The passenger door was ajar, and a large amount of blood was on the vehicle's interior. The officers secured the vehicle, believing that it was a crime scene. Blood was subsequently found on the vehicle's seat, armrest, floor, door panel, and console. The front passenger side wheel was also flat.

Officer Austin then entered the hospital to locate the driver of the silver/gray vehicle. In the ER lobby, he found [Appellant] exiting the bathroom. There, [Appellant] informed the officer that an altercation took place at a cookout and someone there was shot. The police later took [Appellant] to the Homicide Unit for questioning.

On July 20, 2014, [Appellant] gave a statement to police, in which he told detectives that he was present when a shooting occurred at Beechwood. He said that he saw a fight break out at a block party and then heard gunshots. He also said that after the gunshots, Fields, his friend, said to him that he could not

- 3 -

breath[e]. [Appellant] stated that Fields had asthma. He claimed that after he and Fields got into his car to drive to the hospital, Fields coughed up blood.

Police later recovered a security video from Einstein Hospital. On the night of the shooting, at approximately 11:25:28, the camera captured [Appellant's] vehicle driving up to the hospital's emergency room ramp. At 11:26:14, the video showed [Appellant's] vehicle, both doors open, pulling up outside the ER. [Appellant] existed [*sic*] the vehicle wearing a red polo shirt. Roughly thirty seconds later, [Appellant] removed the shirt, and threw it over a guardrail past where his vehicle was parked. A few minutes later, [Appellant] retrieved the shirt and tossed it into the trunk of the vehicle.

The police later recovered the gun that was lying near the hospital guardrail. The gun, a revolver, held two fired cartridge casing ("FCCs") and three live rounds—all of which were .38 caliber and of the same manufacture. A total of four ballistic pieces were recovered from the shooting scene at 6088 North Beechwood Street, including two copper fragments found on the property, a lead fragment in the outside wall near the doorframe, and a projectile in the front door, five inches south of the doorknob. Officer Raymond Andrejczak, of the Police Firearms Identification Unit, concluded to a reasonable degree of scientific certainty that both copper fragments, the projectile, and both FCCs in the gun were all fired in and from the subject revolver. The remaining piece (the lead fragment) was unsuitable for microscopic comparison, but was consistent with a 9 millimeter/.38 caliber projectile. The subject revolver was incapable of firing a 9 millimeter bullet.

Trial Court Opinion, 4/18/16, at 2–5 (record citations omitted).

On August 4, 2014, police arrested Appellant for the murder of Fields. After a January 28, 2016 trial, a jury found Appellant guilty of [first-degree murder, attempted murder, unlawful possession

of a firearm, and possession of an instrument of crime.[1]]  The trial court [immediately sentenced Appellant to life in prison without parole].  On January 29, 2016, Appellant filed a post-sentence motion challenging the weight and sufficiency of the evidence.  The trial court denied that motion on February 11, 2016.

*Commonwealth v. Palmer*, 861 EDA 2016, at *1-4 (Pa. Super. May 17, 2017) (unpublished memorandum).  Appellant filed a timely appeal.  This Court affirmed his judgment of sentence on May 17, 2017, *see id.*, and the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on January 3, 2018.  *Commonwealth v. Palmer*, 285 EAL 2017 (Pa. Jan. 3, 2018).

On December 20, 2018, Appellant filed a *pro se* PCRA petition.[2]  **See** Motion for Post Conviction Collateral Relief, 12/20/18, at 4.  The PCRA court appointed PCRA counsel for Appellant, who filed an amended petition on December 31, 2018.  In his amended petition, Appellant raised various claims of ineffective assistance of counsel.  On July 9, 2019, the Commonwealth filed a motion to dismiss Appellant's PCRA petition.  The PCRA court issued notice of its intent to dismiss Appellant's petition without a hearing pursuant to Rule 907 of the Pennsylvania Rules of Criminal Procedure on July 23, 2019.  Appellant filed a timely response to the PCRA court's Rule 907 notice on August 9, 2019.  On August 29, 2019, the PCRA court dismissed Appellant's

---

[1] 18 Pa.C.S.A. §§ 2502(a), 901, 6106 and 907.

[2] On the same date, Appellant's trial counsel filed a separate PCRA petition on Appellant's behalf.  Because Appellant's trial counsel was not appointed to represent Appellant through his collateral proceedings, the PCRA court did not consider this filing or any of the claims raised therein.

- 5 -

petition. Appellant timely appealed to this Court. The PCRA court did not order Appellant to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925, and Appellant did not file one.

On appeal, Appellant presents four issues for our review:

1. Did the lower court err by dismissing Appellant's PCRA Petition without [a] hearing where trial counsel was ineffective for failing to object to the lower court's erroneous vital body part instruction?

2. Did the lower court err by dismissing Appellant's PCRA Petition without [a] hearing where trial counsel was ineffective for failing to object to the lower court's accomplice liability instruction?

3. Did the lower court err by dismissing Appellant's PCRA Petition without [a] hearing where trial counsel was ineffective for failing to move to suppress the identifications in Appellant's case?

4. Did the lower court err by dismissing Appellant's PCRA Petition without [a] hearing where trial counsel was ineffective for presenting a closing argument that confused the issues, was prejudicial, and unrelated to [Appellant's] case?

Appellant's Brief at 2 (suggested answers omitted).

"In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014) (quotations and citations omitted). "To be entitled to PCRA relief, [an] appellant must establish, by a preponderance of the evidence, [that] his conviction or

sentence resulted from one or more of the enumerated errors in 42 Pa.C.S.[A.] § 9543(a)(2)[.]" ***Id.***

All four of Appellant's claims assert instances of ineffective assistance of trial counsel (Counsel). With respect to ineffective assistance of counsel claims, our Supreme Court has stated:

> It is well-settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. ***Commonwealth v. Cooper***, 941 A.2d 655, 664 (Pa. 2007). To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, "that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different." ***Id.*** A PCRA petitioner must address each of these prongs on appeal. ***See Commonwealth v. Natividad***, 938 A.2d 310, 322 (Pa. 2007) (explaining that "appellants continue to bear the burden of pleading and proving each of the ***Pierce*** elements on appeal to this Court"). A petitioner's failure to satisfy any prong of this test is fatal to the claim. ***Cooper***, 941 A.2d at 664.

***Commonwealth v. Wholaver***, 177 A.3d 136, 144 (Pa. 2018) (citations modified).

### **Vital Body Part Instruction: Failure to Object**

In his first ineffectiveness claim, Appellant argues that Counsel was ineffective for failing to object to the trial court's "erroneous" jury instruction regarding the "use of a deadly weapon on the 'victim's body' without clarifying that the victim could only be the intended target." Appellant's Brief at 9. Appellant contends that Counsel should have objected to the vital body part

jury instruction, asserting that the jury was misled into believing that they could infer specific intent[3] through the use of a deadly weapon on a vital body part despite the Commonwealth's evidence reflecting transferred intent.[4]  ***Id.***

With respect to jury instruction challenges, our Supreme Court has held:

When reviewing a challenge to jury instructions, the reviewing court must consider the charge as a whole to determine if the charge was inadequate, erroneous, or prejudicial.  The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration.  A new trial is required on account of an erroneous jury instruction only if the instruction under review contained fundamental error, misled, or confused the jury.

***Commonwealth v. Fletcher***, 986 A.2d 759, 792 (Pa. 2009) (internal citations and quotations omitted).

Here, the trial court instructed the jury that it could "infer that the defendant had the specific intent to kill" if they believed "that the defendant intentionally used a deadly weapon on a vital part of the victim's body."  N.T.,

---

[3] In order to sustain a conviction for first-degree murder, the Commonwealth must prove: 1) the defendant acted with a specific intent to kill; 2) a human being was unlawfully killed; 3) the person accused did the killing; and 4) the killing was done with deliberation.  18 Pa.C.S.A. § 2502(d).  The use of a deadly weapon upon a vital part of the victim's body is sufficient to prove the specific intent required for a conviction of first-degree murder. ***Commonwealth v. Hall***, 701 A.2d 190, 196 (Pa. 1997).

[4] "Pursuant to the doctrine of transferred intent, the intent to murder may be transferred where the person actually killed is not the intended victim." ***Commonwealth v. Jones***, 912 A.2d 268, 279 (Pa. 2006) (citing 18 Pa.C.S.A. § 303(b)(1)).

1/28/16, at 136-37. The court also instructed the jury that it could find specific intent through the doctrine of transferred intent:

Because the Commonwealth has alleged while the defendant intended to kill or actually conspired with the intent to kill Malik Hairston, he actually caused the death of Thomas Fields.

If you find beyond a reasonable doubt that the defendant intended to kill or conspired or was an accomplice with the intent to kill Malik Hairston, and was acting with that intent at the time that he killed Thomas Fields, you may find that the defendant acted with the specific intent to kill under what the law calls the doctrine of transferred intent.

What this means is that if the actual result that the defendant intended differs from what he contemplated, only because a different person than the one actually intended was killed, the element of causing the death with specific intent to kill is still established.

*Id.* at 137-38.

Appellant believes that the jury could only infer specific intent to kill from the use of a deadly weapon on a vital part of the victim's body if the actual victim was the intended victim. This argument fails. In *Commonwealth v. Jones*, 912 A.2d 268 (Pa. 2006), our Supreme Court addressed an identical argument. In rejecting the appellant's claim, the Court concluded, "[t]he very purpose of the transferred intent instruction is to permit appropriate inferences of malice and specific intent to flow to an unintended victim." *Id.* at 280. In the present case, the facts establish that Appellant intended to kill Hairston and that he possessed both the malice and the specific intent to do so. "Transferring this intent to an unintended victim is permitted by statute and easily meets the requirement of a rational

- 9 -

connection between the proven facts and the inference." **Id**. Thus, Appellant's claim lacks arguable merit and his first assertion of ineffective assistance of counsel fails.

## **Accomplice Liability Instruction: Failure to Object**

In his second ineffectiveness claim, Appellant contends that Counsel was ineffective for failing to object to the trial court's jury instruction on accomplice liability because "there was no evidence of a second shooter or accomplice introduced at trial" and "[i]n the absence of any evidence of another shooter or accomplice, . . . the addition of the accomplice liability charge served no purpose but to confuse the jury on the issues." Appellant's Brief at 20-21.

The trial court instructed as follows:

Now, there is a second and separate way in which a defendant can be proved liable for conduct of another person or persons. This is when the defendant is an accomplice of the person who actually commits the crime. There is a basic difference between being an accomplice and being a conspirator.

In a conspiracy people have to act jointly. To be an accomplice, a person does not have to agree to help someone else. The person is an accomplice if he on his own acts to help the other person commit a crime. More specifically, the defendant is an accomplice of another for a particular crime if the following two elements are proved beyond a reasonable doubt: That the defendant had the intent of promoting or facilitating the commission of the crime; and that the defendant solicits, commands, encourages or requests the other person to commit the crime; or aids, agrees to aid or attempts to aid the other person in planning or committing it.

It is important to understand that a person is not an accomplice merely because he is present where the crime is committed or knows that a crime is being committed. A person who is an accomplice will not be responsible for a crime, if and only, if the

- 10 -

person, before the other person commits the crime either stops his own efforts to promote or facilitate the commission of the crime and wholly derives his previous efforts of the effectiveness in the commission of the crime, or gives timely warning to law enforcement authorities, or otherwise makes a proper effort to prevent the commission of crime.

Now I've just given you the general rules of how a person can be responsible for a crime that was committed by another. There are special rules for the crime of first degree murder which is one of the crimes charged here. . . .

\*     \*     \*

A person can also be guilty of the death personally when the Commonwealth proves beyond a reasonable doubt that he was an accomplice. Remember, to be an accomplice, the defendant must have been intended that a first degree murder occurred and that the defendant solicits, commands, encourages or requests the other person to commit it, or aids, agrees to aid, or attempts to aid the other person in planning or committing.

To sum up, a defendant may not be found guilty of the crime of first degree murder where the defendant himself, as a conspirator or as an accomplice, has the specific intent or goal of bringing about a murder in the first degree.

N.T., 1/28/16, at 125-28.

According to Appellant, this accomplice liability instruction served no purpose "but to confuse the jury on the issues." Appellant's Brief at 21. The Commonwealth argues that Appellant's claim completely disregards that the evidence at trial established that, although the Commonwealth argued that Appellant was the shooter, additional evidence was presented "from which the jury could have found that [Appellant] was an accomplice to another person who was the shooter; namely, that the shots were fired from a crowd of approximately ten of [Appellant's] cohorts who were beating Thornton."

- 11 -

Commonwealth's Brief at 14. The Commonwealth further contends that defense counsel alluded throughout trial and during closing argument to the possibility that somebody else was the shooter. *Id.* (citing N.T., 1/25/16, at 139; N.T., 1/18/16, at 52, 135-37).

The record supports the Commonwealth's position that Appellant's conviction for first-degree murder was premised on two theories: Appellant was the shooter; or Appellant was an accomplice to another person who was the shooter. There is no factual predicate to Appellant's argument that the trial court improperly gave an accomplice liability instruction or that the instruction confused the jury on the issues. As such, Appellant cannot prevail on his claim that Counsel was ineffective for failing to object to this charge.[5]

## Motion to Suppress

In his third ineffectiveness claim, Appellant asserts that the trial court was ineffective for failing to file a motion to suppress the pre-trial identifications of Appellant by Hairston and Thornton. Appellant's Brief at 22.

---

[5] In a footnote, Appellant raises an alternative argument, suggesting that "if this Court finds that [trial counsel's] objection was sufficient to preserve the issue for appellate review, then Appellant respectfully avers that [trial counsel] was ineffective as appellate counsel for failing to raise this meritorious claim on direct appeal." Appellant's Brief at 21 n.5. Appellant has failed to develop this argument with citation to and analysis of relevant legal authority. Accordingly, we find this claim waived. **See** Pa.R.A.P. 2119(a); **see also Commonwealth v. Johnson**, 985 A.2d 915, 924 (Pa. 2009) (stating that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived").

According to Appellant, the identifications were "based on an unduly suggestive procedure and uncertain and thus should have been suppressed." *Id.* at 24.

"When . . . an assertion of ineffective assistance of counsel is based upon the failure to pursue a suppression motion, proof of the merit of the underlying suppression claim is necessary to establish the merit of the ineffective assistance of counsel claim." *Commonwealth v. Carelli*, 546 A.2d 1185, 1189 (Pa. Super. 1988) (citations omitted).

An appellate court must assess the reliability of an out-of-court identification by examining the totality of the circumstances. *Commonwealth v. Johnson*, 139 A.3d 1257, 1278 (Pa. 2016). The mere fact that a witness was unsure about the identification does not mean that later identifications were unreliable—initial equivocation does not render later identifications constitutionally unreliable *per se*. *Id.* A pre-trial identification violates due process only when the facts and circumstances demonstrate that the identification procedure was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification. *Johnson*, 139 A.3d at 1278.

The PCRA court found no merit to Appellant's ineffectiveness claim, explaining:

> According to the Petitioner, the photo array identification procedure used by Homicide Detectives in this case was unduly suggestive because the detectives asked the witnesses whether they "recognize anyone" in the arrays, and did not inform the

witnesses that they were unsure if the suspect's photo was included. The detectives' questions were not suggestive, as they did not direct the witnesses' attention to a specific photograph nor did detectives indicate whether [Appellant's] photograph was included in any array. During Hairston's interview, Detective Pitts and Fetters asked him the following question: "I am showing you a photo array, do you recognize anyone?" Detective Harkins and Burns asked Thornton a similar question: "I am showing you a photograph array consisting of eight like males, do you recognize any of these males?" These questions did not suggest to either witness that they should choose [Appellant's] photograph and were properly phrased to obtain a reliable identification.

Thornton confirmed at trial that during his interview, he circled [Appellant's] photograph, identifying him as the shooter. While Hairston testified at trial that detectives forced him to circle [Appellant's] photo, Detective Fetters denied this coercion, and the jury chose to accept Detective Fetters' testimony.

PCRA Court Opinion, 8/29/19, at 6-7 (citations omitted).

Further, the PCRA court rejected Appellant's attempt to attack the detectives' failure to follow the Philadelphia Police Department's "double blind procedure" for conducting photo arrays. The court explained:

This argument is illogical. As [Appellant] establishes in his Amended Petition, the detectives could not have violated these guidelines because they were not put into practice until November 2014, more than four months after Thornton and Hairston were interviewed. [Appellant] cannot fault the Homicide Detectives for failing to follow a procedure that had not been implemented at the time of the identification.

*Id.* at 7.

Given these determinations, the PCRA court concluded that Appellant failed to establish that a motion to suppress Thornton and Hairston's identification of Appellant would have been successful, and trial counsel cannot be found ineffective for failing to file such a motion.

- 14 -

The record supports the PCRA court's conclusions that any attempt to suppress Thornton or Hairston's identification testimony would be meritless. The PCRA court recognized that the jury credited the testimony of Detective Fetters over the testimony of Hairston, in which he alleged coercion by the detectives. We cannot disturb this determination. ***See Commonwealth v. Battle***, 883 A.2d 641, 648 (Pa. Super. 2005) (explaining that credibility determinations are solely within the province of the PCRA court). Accordingly, because Counsel cannot be deemed ineffective for failing to file a meritless suppression motion, Appellant's third issue fails. ***See Commonwealth v. Loner***, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*) (explaining that counsel cannot be deemed ineffective for failing to pursue a meritless claim).

### Closing Argument

In his fourth and final ineffectiveness claim, Appellant argues that Counsel was ineffective because his closing arguments "confused the issues for the jury, prejudiced Appellant, and was unrelated to Appellant's case." Appellant's Brief at 30. Specifically, during closing arguments, Counsel read a poem to the jury to provide an example of reasonable doubt. ***See*** N.T., 1/28/16, at 68-71. Appellant contends that the "strangeness of counsel's ending to his closing argument likely undermined the entirety of his closing, and any arguments made on [Appellant's] behalf." Appellant's Brief at 32.

The PCRA court rejected Appellant's claim of Counsel's ineffectiveness, finding that it failed to demonstrate prejudice. The court noted that Counsel's

example properly illustrated the concept for reasonable doubt, and was not a misstatement of the law. PCRA Court Opinion, 8/29/19, at 10. Moreover, the court emphasized that, following closing arguments, it instructed the jury to only use the court's instructions to assist in their deliberations, and cautioned the jury that counsel's arguments were not facts nor law. *Id.* (citing N.T., 1/28/16, at 22, 71). The PCRA court concluded that because Counsel's definition was an accurate statement of the law and the jury was cautioned to only consider the law as explained by the court, Appellant was not prejudiced by Counsel's inclusion of the poem. *Id.*

As we stated above, "counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness." *Wholaver*, 177 A.3d at 144. Further, "[w]ith regard to 'reasonable basis,' the PCRA court 'does not question whether there were other more logical courses of action which counsel could have pursued; rather, [the court] must examine whether counsel's decisions had any reasonable basis.'" *Commonwealth v. Bardo*, 105 A.3d 678, 684 (Pa. 2014). "Where matters of strategy and tactics are concerned, '[a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.'" *Commonwealth v. Spotz*, 84 A.3d 294, 311–12 (Pa. 2014).

Here, although Appellant may not agree with the strategy pursued by Counsel during closing arguments, he has failed to establish that Counsel was ineffective. The record supports the PCRA court's conclusion that Counsel's closing argument was an accurate statement of law, and the jury was properly instructed to only consider the court's instructions and definitions during their deliberation. As such, Appellant's fourth and final claim of ineffective assistance of counsel fails.

As discussed above, Appellant has not demonstrated that any of his individual claims of ineffective assistance of counsel have merit. Accordingly, because we find no merit to Appellant's issues, we conclude that the PCRA did not err in dismissing Appellant's petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/14/20