J-S13038-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| LARRY RODRIGUEZ | |
| Appellant | No. 720 EDA 2016 |

Appeal from the Judgment of Sentence January 19, 2016
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s): CP-51-CR-0000744-2014

BEFORE: BENDER, LAZARUS, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED MARCH 29, 2017**

Appellant, Larry Rodriguez, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas following a jury trial and his conviction for third degree murder.[1]  Appellant contends the evidence was not sufficient to find him guilty of murder in the third degree. We affirm.

We adopt the facts as set forth in the trial court's opinion.  **See** Trial Ct. Op., 9/15/16, at 2-12.  On January 19, 2016, Appellant was sentenced to eighteen to thirty-six years' imprisonment.  Counsel filed a motion for reconsideration of sentence on January 29, 2016.  Appellant filed a *pro se*

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

notice of appeal on February 26, 2016.[2]  On March 14, 2016, Appellant's

motion for reconsideration of sentence was denied.  Trial counsel filed a

motion to withdraw which was granted and present counsel was appointed.

Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors

complained of on appeal and the trial court filed a responsive opinion.

Appellant raises the following issue for our review:

> Was the evidence insufficient to sustain Appellant's third
> degree murder conviction because the Commonwealth
> failed to prove that the killing was committed with malice
> as it is clear from the facts that the killing occurred in the
> heat of passion stemming from the victim's larcenous
> behavior and the use of drugs and alcohol by both
> Appellant and the victim?

Appellant's Brief at 3.[3]  Appellant contends

> that his conviction for third-degree murder cannot stand
> because the Commonwealth failed to prove that he acted
> with malice.  It is his contention that the most he could
> have been convicted of is heat of passion voluntary
> manslaughter because the facts of the case show that the
> killing occurred while [A]ppellant was under the influence
> of drugs and alcohol and was under the belief that the

---

[2] The trial court noted that "[s]ince [Appellant's] *pro se* notice of appeal was docketed in the Superior Court, [counsel] did not file a notice of appeal. **See** Trial Ct. Op. at 1; **see also Commonwealth v. Cooper**, 27 A.3d 994, 1007 (Pa. 2001), (holding "[t]he proper way to view the *pro se* appeal . . . is as a premature appeal that was perfected upon the trial court's proper consideration and denial of the counseled post-sentence motions."

[3] Appellant did not file a post-sentence motion challenging the sufficiency of the evidence.  However, a sufficiency of the evidence claim can be raised for the first time on appeal.  Pa.R.Crim.P. 606(A)(7); **Commonwealth v. Coleman**, 19 A.3d 1111, 1118 (Pa. Super. 2011).

decedent and her cohorts were taking money and property from him.

* * *

In the instant matter, the cumulative events of the evening in question and the decedent's aggressive behavior constituted reasonable provocation. Appellant, the decedent, and associates of the decedent were drinking and doing drugs for hours prior to the incident. During that period of time, [A]ppellant believed that his personal belongings and money were being taken by the decedent and her associates. In addition, the decedent herself became violent as evidenced by the injuries to [A]ppellant which were observed by the police, who stated that the wounds to [A]ppellant were still fresh when they arrived.

It is submitted that the Commonwealth failed to sufficiently disprove that [A]ppellant was seriously provoked to kill the victim out of an actual sudden and intense heat of passion. Even when viewed in the light most favorable to the Commonwealth, the evidence overwhelmingly demonstrates that a reasonable person faced with the same cumulative events and the same victim would have easily been provoked. The evidence also shows that Appellant actually believed that the victim, who significantly outweighed him intended to [sic] him and steal from him. This mistaken belief, [A]ppellant's subsequent impassioned utterances when the police arrived show that he actually acted in the heat of passion when he killed the victim. The successive nature of the evening's events show the provocation led directly to the killing, and that [A]ppellant did not have the opportunity for cooling time.

*Id.* at 16, 20-21.

"A claim challenging the sufficiency of the evidence is a question of

law." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not

- 3 -

require a court to ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict.

\* \* \*

When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt.

***Commonwealth v. Ratsamy***, 934 A.2d 1233, 1235-37 (Pa. 2007)

(citations and quotation marks omitted).

The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The proper application of this standard requires us to evaluate the entire trial record, and all evidence actually received, in the aggregate and not as fragments isolated from the totality of the evidence. Our law is crystal clear that the trier of fact, in passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence presented. The Superior Court may not reweigh the evidence and substitute our judgment for that of the finder of fact. If the factfinder reasonably could have determined from the evidence adduced that all of the necessary elements of the crime were established, then that evidence will be deemed sufficient to support the verdict.

- 4 -

*Commonwealth v. Hopkins*, 747 A.2d 910, 913–14 (Pa. Super. 2000)

(citations omitted).

Section 2502(c) of the Crimes Code defines third degree murder:

> **(c) Murder of the third degree.**—All other kinds of murder shall be murder of the third degree.[4] Murder of the third degree is a felony of the first degree.

18 Pa.C.S. § 2502(c). In *Commonwealth v. Marquez*, 980 A.2d 145 (Pa.

Super. 2009) (*en banc*), this Court opined:

> Third-degree murder is defined [as] all other kinds of murder other than first degree murder or second degree murder. The elements of third-degree murder, as developed by case law, are a killing done with legal malice.
>
> Malice exists where there is a particular ill-will, and also where there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty.

*Id*. at 148 (citations and quotation marks omitted). "Malice is established

where an actor consciously disregard[s] an unjustified and extremely high

risk that his actions might cause death or serious bodily harm."

---

[4] Murder in the first and second degree is defined as follows:

> **(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
>
> **(b) Murder of the second degree.**—A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

18 Pa.C.S. § 2502(a)-(b).

***Commonwealth v. Devine***, 26 A.3d 1139, 1146 (Pa. Super. 2011) (citation and quotation marks omitted). "Malice may be inferred by considering the totality of the circumstances." ***Commonwealth v. Dunphy***, 20 A.3d 1215, 1219 (Pa. Super. 2011) (citation omitted).

In fact, our Pennsylvania Supreme Court "has held on several occasions that evidence of death by strangulation can be sufficient to establish the requisite intent for first-degree murder." ***Commonwealth v. Martin***, 101 A.3d 706, 718–19 (Pa. 2014), *cert. denied*, 136 S.Ct. 201 (2015). In ***Commonwealth v. Cooper***, 941 A.2d 655 (Pa. 2007), the court held that evidence of "death by manual strangulation was sufficient to establish that **the perpetrator acted maliciously** and with a specific intent to kill." ***Id.*** at 662 (citation omitted and emphasis added).

After careful consideration of the record, the parties' briefs, and the well-reasoned decision of the Honorable Rose Marie DeFino—Nastasi, we affirm on the basis of the trial court's decision. ***See*** Trial Ct. Op. at 13-17 (holding Appellant's act of strangling the decedent constituted the requisite malice for third degree murder). Accordingly, having discerned no error of law, we affirm the judgment of sentence. ***See Ratsamy***, 934 A.2d at 1235-37.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/29/2017

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

## CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :     CP-51-CR-0000744-2014

v.     **FILED**     720 EDA 2016

LARRY RODRIGUEZ     SEP **1 5** 2016

Criminal Appeals Unit
First Judicial District of PA



CP-51-CR-0000744-2014 Comm. v. Rodriguez, Larry
Opinion

7499785031

## OPINION

Rose Marie DeFino-Nastasi, J.

## **PROCEDURAL HISTORY**

On October 5, 2015, the Defendant was found guilty after a jury trial, presided over by the Honorable Rose Marie DeFino-Nastasi, of Third Degree Murder, 18 Pa.C.S. § 2502(c), as a felony of the first degree.

On January 19, 2016, Defendant was sentenced to eighteen (18) to thirty-six (36) years for the third degree murder conviction.

Trial counsel, Joseph Valvo, Esq., filed a Motion for Reconsideration of Sentence on January 29, 2016. While the motion was still pending before this court, the Defendant filed a *pro se* notice of appeal to the Superior Court on February 26, 2016.

On March 14, 2016, the motion filed by Attorney Valvo was denied without a hearing. Since the Defendant's *pro se* notice of appeal was docketed in the Superior Court, Attorney Valvo did not file a notice of appeal.

On May 9, 2016, Attorney Valvo filed a Motion to Withdraw as Counsel, which this court granted on May 10, 2016. John Belli, Esq. was appointed by the Court Appointments Unit on May 23, 2016.

1

On June 20, 2016, Attorney Belli filed a Rule 1925(b) Statement of Matters Complained of on Appeal, pursuant to an Order of the court, claiming that the evidence was insufficient to sustain the verdict of guilt for third degree murder because the Commonwealth failed to prove that the killing was committed with malice because it occurred in the heat of passion "stemming from the victim's larcenous behavior and the use of drugs and alcohol by both appellant and the victim."[1]

## STATEMENT OF FACTS

Philadelphia Police Officers Brian Saba and Andrew McCrea responded to a radio call of a person screaming on the 1400 block of Poplar Street in North Philadelphia at approximately 6:00 a.m. on June 30, 2012. N.T. 09/30/15 at pp. 33-36. A black female, identified as Rolanda Anderson (a/k/a Rhonda Toland), was in the middle of the street when they arrived, "screaming and yelling [] that her friend was inside of 1430 [Poplar Street] dead." *Id.* at pp. 8, 34-35, 47. Ms. Toland stated to the officers that the Defendant would not let her into the apartment or her friend out, and that she knew that her friend was dead. *Id.* at pp. 35-36. Officer Saba entered the duplex through the main front door and knocked on the door of the apartment. The Defendant opened the door, pointed towards the back bedroom, and said, "She's back there. She overdosed." *Id.* at pp. 35-36, 39.

Officer Saba looked down the hallway into the bedroom and observed the decedent, Sonya Lewis, lying on her back on the ground with an air mattress on top of her. *Id.* at pp. 36, 39-40. The officer walked into the room and moved the air mattress. The decedent was unresponsive. *Id.* at pp. 39-40. He then walked into the living room where the Defendant and

---

[1] Counsel requested that he be permitted to file a supplemental Rule 1925(b) statement if the Defendant requested additional issues be raised on appeal. On June 22, 2016, Defendant filed a *pro se* Rule 1925(b) statement. On June 27, 2016, the court ordered counsel to file a supplemental statement. Counsel subsequently indicated to the court after review of the record that he would not be filing a supplemental statement.

2

another female who was in the residence when the officers arrived, identified as Marquita Oglesby, were standing. *Id.* at pp. 38-40, 47. At that time, Officer Saba observed scratches on the Defendant's face with fresh blood in the scratches. *Id.* at p. 41.

Officer McCrea testified that the Defendant was "irate," "talking loud" at the ceiling, and kept stating that "they" were "setting him up," "they were sticking pills in her ass while she was tied up," and "I never touched her. I was jerking off." *Id.* at pp. 55-57, 62-63.

The Defendant was transported to homicide headquarters. Detective Greg Singleton testified that he observed scratches on the Defendant's forehead, left cheek, and underneath his bottom lip. N.T. 09/30/15 at pp. 74-75. The Defendant, whom the detective described as "coherent and well-spoken," was *Mirandized* and gave a full statement. *Id.* at p. 96. The relevant portions is as follows:

Question: Mr. Rodriguez, I'm Detective Singleton. I'll be asking you several questions concerning the death of Sonya Lewis on June 30, 2012 at approximately 6:06 a.m. inside of 1430 Poplar Street, Apartment A. Before we get started I'm going to ask some personal questions that we ask everyone. Okay?

Answer: Okay.

Question: Do you read, write and understand English?

Answer: Yes.

Question: What's the highest grade you completed in school?

Answer: Sixteen years.

Question: Does those 16 years of school include college?

Answer: Yes.

3

Question:   What college did you attend?

Answer:     Burlington County College, Rider University and Thomas Edison

            College and Thomas Jefferson University.

Question:   Are you presently under the influence of drugs or alcohol?

Answer:     No.

Question:   Are you known by any other names or nicknames?

Answer:     Lorenzo.

Question:   Were you born here in the United States?

Answer:     I was born overseas on a military installation in Ancon Panama.

. . .

Question:   Are you an American Citizen?

Answer:     Yes. I was in the Army and I have an honorable discharge from

            service.

Question:   Mr. Rodriguez, tell me and Detective Spotwood in your own words

            what happened inside your apartment this morning.

Answer:     I was home on my steps smoking a cigarette. They started coming

            up to me. I don't even know their names. It was one girl in the

            beginning asking me for a cigarette. I gave her a cigarette and she

            offered me drugs. I was drunk and I took her in the apartment and

            we got high. She took advantage of me sexually then she helped

            herself to my bank card. I was high and I don't remember giving

            her my PIN number. She went and got money and she came back

            with the woman that is deceased. She left the deceased woman

4

with me and left. She went to go get drugs. While the deceased woman was there, she tried to take my bank card. I wouldn't give her the right PIN number. She kept leaving the apartment and coming back because she didn't have the right number. She started getting mad and bullying me and telling me to give her the PIN number. She was trying to pick a fight. She was doing her drugs and I was doing my drugs. She started taking my medication from my cabinet and putting [it] in her ass. She started taking my T-shirts and cologne and other clothes since she couldn't get my PIN number. I started ripping the bag up that she was putting my stuff in. She started attacking me and trying to take my drugs out of my hands. She was scratching my face and hitting me and biting me. She was so heavy I couldn't move. I rolled around and I choked her. She was trying to choke me and I was choking her back. Then she calmed down and I didn't know what to do so I just tied her up so she wouldn't attack me again. I thought she was sleeping because she was snoring and farting. I got paranoid because I didn't know how to get her out of my house without getting beat up by the people that was outside. I smoked the rest of the drugs I had and got high while I tried to figure out what to do. Then her other friends came back knocking on the door. I didn't want to let them in and I did. Then they came in and that's when I found out that she was dead, because the little girl went in the room and saw

her and she started screaming. I told the guy in the red hat to call the cops. The cops came and arrested me.

Question:     Tell me everyone that was in the apartment with you when the incident took place.

Answer:     Just me and the deceased girl. The other ones were out selling drugs and tricking.

Question:     Who were the other ones that you are referring to?

Answer:     The first girl that I got high with. She was big with big tits and long black hair. She was with a skinny girl and a guy with the red baseball cap. He's the one that took my military ring. It was 132 Infantry and the 10th Mountain with my name on it and the last three of my Social Security number, 139, on the inside. They were bullying me and forcing their way into the apartment and stealing my shit. There were people outside too.

Question:     Do you know the guy's name in the red hat?

Answer:     No.

Question:     Can you describe the guy in the red hat further to me?

Answer:     He's a black guy, shorter than me (5'5" or 5'6"), red baseball cap, it looked fitted, skinny. He was dark complected, bald head or a tight fade wearing a white T-shirt.

Question:     Have you ever seen the guy in the red baseball cap before?

Answer:     I've never seen him before.

Question: The scratches you have on your face, are they as a result of your altercation this morning?

Answer: Yes.

Question: Tell me how you got the injuries to your left hand.

Answer: A combination from punching her and her biting me trying to get the drugs out of my hand and from me choking her.

Question: What did you tie the deceased's hands up with?

Answer: I used my belt to tie her hands behind her back. I used socks on her feet and I used the bed to block the door.

Question: Is there anything you wish to add to your statement.

Answer: No.

Question: I'm going to show you a single photo. Can you tell me if you recognize this person?

Answer: That's the lady that attacked me. (Photo shown of [decedent] Sonya Lewis)

Question: I'm going to show you another photo. Can you tell me if you recognize this person?

Answer: That's the first lady that I gave my PIN card to. She was the one that set everything up and brought the deceased girl over. (Photo shown of Rhonda Toland)

Question: Do you know this person?

Answer: She's the one that went in the room and found out that she was dead. (Photo shown of Marquita Oglesby)

7

Question:     What bank card did you give to the first lady?

Answer:      Chase Bank. The numbers on the card is 511809002790763 and
             the back PIN number is 253. The expiration date is December
             2014. It's a dark red debit card and it's chewed up on the borders.

Question:     What's your PIN number to your Chase Bank debit card?

Answer:      1911.

Question:     Do you know what ATM she used?

Answer:      Whatever one that's around there close. The bank should be able to
             tell you that. Their number is 1-888-565-6505.

Question:     Where is your Chase Bank card now?

Answer:      I'm not sure. It might be in the house and it might not be. The
             whole house is tore up from the fight.

Question:     Did you have any sexual contact with the deceased?

Answer:      No.

Question:     Did you take any of her clothes off?

Answer:      Yes. I took her pants and her shirt off.

Question:     Why did you take her pants and her shirt off?

Answer:      Because she shit her pants and I didn't want it to get on my bed.

*Id.* at pp. 82-90.

Detective James Griffin testified that a banking representative from Chase Bank was unable to locate any viable accounts for the Defendant based on the information he provided. *Id.* at pp. 119-20.

8

Marquita Oglesby testified that she had known the Defendant "Lorenzo" for a month or so in June of 2012. She had been working as a prostitute and knew the Defendant from spending time in the neighborhood. N.T. 09/30/15 at pp. 129-32, 164-65. She also knew Ms. Toland, who was also a prostitute. *Id.* at p. 133.

Ms. Oglesby had a "date" at the Carlisle Hotel across the street from the Defendant's apartment on the night of the incident. She saw Ms. Toland and the decedent on Poplar Street on her way to the hotel. They were going to the Defendant's apartment. *Id.* at pp. 134-35. Ms. Oglesby finished her date and ran into Ms. Toland when she was walking home near Broad Street and Girard Avenue the next morning. Ms. Toland was high and asked Ms. Oglesby to go to the Defendant's apartment with her to bring him a bag of crack and to check on the decedent. *Id.* at pp. 138-40. Ms. Oglesby agreed.

When they arrived at the Defendant's apartment, the Defendant cracked the front door to the apartment building open, peeped out, and asked Ms. Toland if she had the drugs for him. "He looked scratched up" and seemed "high." Ms. Toland responded "yes" and asked where the decedent was. The Defendant left the front door to the building open, ran into his apartment, and locked the door. *Id.* at pp. 141-47. The two women banged on the door of his apartment several times. Ms. Toland then went outside and started banging on the windows to the Defendant's apartment. After Ms. Oglesby threatened to pull the fire alarm, the Defendant opened the door and the two women walked in. *Id.* at pp. 146-48.

When Ms. Oglesby asked the Defendant where the decedent was, he responded that "she left." *Id.* at pp. 142-43. The door to the bathroom was open and the door to the bedroom was closed. The entire apartment looked as if it had been hit by a tornado. Ms. Oglesby approached the door to the bedroom and asked the Defendant what was going on in there. The Defendant

9

stood in front of her and blocked her from entering the door, but eventually allowed Ms. Oglesby to go in. *Id.* at pp. 148-49.

Ms. Oglesby testified that the bedroom "didn't look right." *Id.* at p. 143. An air mattress was hanging off of the bed. *Id.* at p. 150. Ms. Oglesby lifted up the air mattress and found the decedent underneath. The decedent was lying on her back on the floor. Her pants and underwear were pulled down by her knees. *Id.* at p. 151. The Defendant told Ms. Oglesby that the decedent overdosed. He then walked over to his freezer, took out "three straights," and began to smoke crack. *Id.* at p. 159. The Defendant kept saying "help me, just help me" and started "talking about trying to get rid of the body and insurance." *Id.* at pp. 144, 153.

Ms. Toland ran out of the apartment screaming, "He choked her. He choked her." *Id.* at pp. 143-44. After she left, another guy from the neighborhood, "Dexter," came into the Defendant's apartment and said, "He killed my sister. What's going on, man? . . . What you got for me, man? What you got?" The Defendant handed him his military ring and Dexter left. *Id.* at pp. 154-55. Ms. Oglesby testified that neither Ms. Toland, Dexter, nor she put anything into the decedent's body. *Id.* at pp. 160-62.

Officer Christine Hilbert, Crime Scene Unit, testified that the decedent was laying on the floor of the rear bedroom with an air mattress next to her. N.T. 10/01/15 at pp. 43-44. Her arms were stretched upwards over her head and to her sides. *Id.* at p. 48. A sock was tied around her right wrist and a second sock was tied around her right ankle. *Id.* at pp. 45, 48. There was no evidence that the decedent had defecated on herself as the Defendant indicated to detectives in his statement. *Id.* at pp. 46-47.[2]

---

[2] Dr. Albert Chu, Deputy Medical Examiner, likewise testified that there was no evidence indicating that the decedent had defecated on herself. N.T. 10/01/15 at pp. 20-21.

Officer Hilbert did not observe any bottles of alcohol or drugs anywhere in the Defendant's apartment. *Id.* at p. 49. She collected two swabs of a white powder-substance that was near the decedent's body. *Id.* at p. 37. Counsel stipulated that there were no detectable commonly controlled substances in either sample. *Id.* at p. 58.

Dr. Albert Chu, Deputy Medical Examiner, testified that the cause of death was strangulation and the manner of death was homicide. N.T. 09/30/15 at pp. 189-191. The evidence of strangulation included petechiae (bleeding in the eyelids), compression of the neck, hemorrhages into the muscles of the neck, and a fracture of the thyroid cartilage. *Id.* at pp. 191-92. The decedent had abrasions to the left cheek, chin, right wrist, right hand, right buttock, and small tears on the inside of her lips. *Id.* at pp. 192, 213.

Dr. Chu testified that a certain amount of pressure must be applied to the neck for a certain amount of time in order for a person to lose consciousness. *Id.* at pp. 195-96. For a person who is not fighting and willingly being suffocated, it takes approximately ten (10) to twelve (12) pounds of pressure around the neck to block the carotid arteries, the vessels that supply blood to the brain. *Id.* When the blood flow to the brain is completely blocked, unconsciousness can occur in ten (10) to fifteen (15) seconds. *Id.* at pp. 200-01. If the pressure on the neck is maintained to the point of unconsciousness but then released, the person will generally regain consciouseness. Dr. Chu opined that it requires two (2) to five (5) minutes of sustained pressure on the neck to cause death by strangulation. *Id.* at p. 197. Bleeding in the eyelids (petechiae) is caused when the blood enters the brain and is unable to drain, causing pressure to build. *Id.* at pp. 200-01.

Defense expert, Dr. Lawrence Guzzardi, testified that the decedent's blood alcohol content (BAC) was 211 milligrams per deciliter, two-and-a-half times the legal limit. N.T. 10/01/15 at pp. 76-77. An individual with a BAC of .211 "would be falling down[,] exhibiting

11

visible signs of intoxication, slurred speech, and incoordination[.]" *Id.* at p. 92. The decedent also had 290 micrograms per liter of cocaine in her system. *Id.* at p. 76. "[T]ypically, at a hundred micrograms per liter an individual would be considered high on cocaine." *Id.* at pp. 77-78. The decedent had 3100 micrograms per liter of benzolecgonine in her system, the inactive metabolite of cocaine. *Id.* at pp. 78-80. The levels of cocaine in the decedent's body indicated that she had been using the drug for "some period of time, hours, and/or longer." *Id.* at p. 77. Additionally, he testified that the combination of drugs and alcohol in the decedent's system would likely cause an increase in aggression and lessen inhibition. *Id.* at p. 106.

Dr. Guzzardi testified that all of the chemicals present in an individual's system, the medical conditions of the individual, and the pharmaceutical products present in her blood at the time pressure is applied to the neck and subsequently released would affect that person's ability to regain consciousness. *Id.* at pp. 83-84. The decedent had asthma, hypertension, and was morbidly obese. Dr. Guzzardi opined that these conditions would cause the decedent to "have an impaired ability to revive from a period of hypoxia" and therefore, her ability to regain consciousness after asphyxiation would be impaired. *Id.* He also opined that the alcohol and cocaine in the decedent's system would have a "very significant effect on the ability to revive subsequent to a period of asphyxiation." *Id.* at p. 85.

Buccal swabs and fingernail clippings were taken from the Defendant and the decedent. The Defendant's right and left hand nail clippings contained a mixture of DNA originating from the Defendant and the decedent. The decedent's right and left hand nail clippings contained a mixture of DNA originating from the Defendant and the decedent. A sample taken from the right pocket of the jeans that the Defendant was wearing at the time of his arrest contained a mixture of DNA originating from the Defendant and the decedent. *Id.* at pp. 60-62.

12

## ANALYSIS

Defendant argues that the evidence was insufficient to support the jury's verdict of guilt for third degree murder because "the Commonwealth failed to prove that the killing was committed with malice as it is clear from the facts that the killing occurred in the heat of passion stemming from the victim's larcenous behavior and the use of drugs and alcohol" by both the Defendant and the decedent.

The standard of review for a challenge to sufficiency is well-settled.

The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court

13

is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Com. v. Slocum*, 86 A.3d 272, 275–76 (Pa. Super. 2014) (citing *Com. v. Bostick*, 958 A.2d 543, 560 (Pa. Super. 2008), app. denied, 987 A.2d 158 (Pa. 2009) (quoting *Com. v. Smith*, 956 A.2d 1029, 1035-36 (Pa. Super. 2008) (*en banc*)).

To establish the offense of third degree murder, the Commonwealth need only prove beyond a reasonable doubt that the defendant killed an individual, with legal malice, i.e. that he "consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm." *Com. v. Devine*, 26 A.3d 1139, 1146 (Pa. Super. 2011) (citing *Com. v. Young*, 431 A.2d 230, 232 (Pa. 1981) (emphasis added)). "Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty." *Id.* (citing *Com. v. Hardy*, 918 A.2d 766, 774 (Pa. Super. 2007), app. denied, 940 A.2d 362 (Pa. 2008)). Malice may be inferred after considering the totality of the circumstances. *Com. v. Gonzalez*, 858 A.2d 1219, 1223 (Pa. Super. 2004), app. denied, 871 A.2d 189 (Pa. 2005).

Section 2503 of the Pennsylvania Crimes Code provides that: A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the

14

killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed. 18 Pa.C.S. § 2503(a). Voluntary manslaughter is the appropriate verdict when the killing is in the "heat of passion" as a result of provocation by the victim. *See Com. v. Kim,* 888 A.2d 847, 853 (Pa. Super. 2005), app. denied, 899 A.2d 1122 (Pa. 2006). "The test for [serious] provocation is whether a reasonable person confronted by the same series of events, would become impassioned to the extent that his mind would be incapable of cool reflection." *Id.* (internal quotations, citations, and edits omitted).

Defendant does not dispute that he strangled the decedent and that the decedent died as a result of his actions. He only disputes the jury's finding that he acted with malice. Defendant argues that he killed the decedent in the heat of passion and, thus, the evidence is insufficient to sustain the jury's verdict of guilt for third degree murder. Defendant's claim is without merit. The trial court charged the jury in this case on the elements of voluntary manslaughter as well as third degree murder. The jury found that the Defendant's conduct amounted to third degree murder. Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, there is ample evidence that Defendant either knew or recklessly disregarded the fact that Sonya Lewis would die when he strangled her into and past unconsciousness.

The only evidence that the killing was committed in the heat of passion as a result of provocation by the decedent's "larcenous behavior" came from the Defendant's self-serving statement, which was replete with inconsistencies and contradicted by the physical evidence. Defendant provided three different accounts as to what happened to the decedent – first, when Marquita Oglesby attempted to ascertain the decedent's whereabouts, he stated that "she [had] left" his apartment; then, when Ms. Oglesby discovered the decedent's body on the floor of the Defendant's bedroom, he claimed that she "overdosed"; and lastly, the jury heard the version of

15

events from the Defendant's statement to detectives, i.e. that the Defendant was defending himself.

The Defendant stated to Detective Singleton that the decedent and he were drinking and doing drugs, and that at some point, the decedent tried to take his bank card. When he would not give her the PIN number for his card, the decedent started "bullying" him, putting his t-shirts, cologne, and medication in a bag. Defendant provided Detective Singleton with his account and PIN number for Chase Bank, both nonexistent.

When the Defendant ripped up the bag in an attempt to stop the decedent from taking his belongings, the decedent started "attacking" him, scratching his face, hitting, and biting him. Defendant stated to the detectives that he "rolled around" and "choked" the decedent until she "calmed down," then "tied her up" with a belt and socks. At the end of this violent struggle, the Defendant had a few scratches to his face and left hand while the decedent lay strangled to death on the floor of his bedroom with her pants and underwear pulled down to her knees, socks tied around her right wrist and right ankle, and the Defendant's air mattress on top of her. Although Defendant claimed that he took the decedent's pants off because she defecated, neither the Crime Scene Unit nor the Medical Examiner's testimony supported this.

Dr. Albert Chu determined that the decedent's cause of death was strangulation based on findings of bleeding of the eyelids, compression of the neck, hemorrhages of the muscles of the neck, and a fracture of the thyroid cartilage. He testified that two to five minutes of sustained pressure on the neck is required to cause death by strangulation. It takes approximately ten to twelve pounds of pressure around the neck of a person who is *willingly* being suffocated to lose consciousness, and if the pressure is maintained to the point of unconsciousness but then released, the person will typically regain consciousness. Therefore, the veracity of the

16

Defendant's self-serving claim that he choked the decedent after *she* attacked him and *only* until she "calmed down" was for the jury to decide. *Com. v. Hopkins,* 747 A.2d 910, 914 (Pa. Super. 2000) (factfinder may believe all, part, or none of the evidence).

The jury found the Defendant guilty of third degree murder. The Pennsylvania Supreme Court has found evidence of death by strangulation sufficient to establish the requisite intent for *first* degree murder. *See Com. v. Martin,* 101 A.3d 706, 719 (Pa. 2014), cert. denied, 136 S. Ct. 201, 193 L. Ed. 2d 155 (2015) (appellant acted with malice and a specific intent to kill by strangling victim until she was dead); *Com. v. Cooper,* 941 A.2d 655, 662 (Pa. 2007) (same). Consequently, Defendant's act of strangling the decedent in this case certainly demonstrated an extreme indifference to the value of human life and an unjustified and extremely high risk that his conduct would result in death or serious bodily injury to the decedent so as to constitute the requisite malice for third degree murder. Accordingly, no relief is due.

## CONCLUSION

Based on the foregoing, the judgment of sentence of the trial court should be affirmed.

By the Court:

Rose Marie DeFino-Nastasi, J.

17

**Commonwealth v. Larry Rodriguez**
CP-51-CR-0000744-2014
Opinion

## Proof of Service

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P. 114:

Appellant:                    Larry Rodriguez, MJ 3361
                              SCI Retreat
                              660 State Route 11
                              Hunlock Creek, PA 18621

Type of Service: ( ) Personal  (x) First Class Mail  ( ) Other, Please Specify:

Counsel:                      John Belli, Esq.
                              2 Penn Center
                              1500 JFK Blvd, Suite 900
                              Philadelphia, PA 19102

Type of Service: ( ) Personal  (x) First Class Mail  ( ) Other, Please Specify:

District Attorney:            Philadelphia District Attorney's Office
                              Appeals Unit
                              Widener Bldg.
                              3 South Penn Square
                              Philadelphia, PA  19107

Type of Service: ( ) Personal  ( ) First Class Mail  (x) Inter-Office

Date: 09/15/2016

Lauren Alfaro, Esq.
Law Clerk to the Honorable Rose Marie DeFino-Nastasi