J-A06035-20

2020 PA Super 99

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| STEVEN MILLER | : | No. 3558 EDA 2018 |

Appeal from the Order Entered December 7, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011245-2012

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| STEVEN MILLER | : | |
| | : | |
| Appellant | : | No. 74 EDA 2019 |

Appeal from the Order Entered December 7, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011245-2012

BEFORE: STABILE, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED APRIL 17, 2020**

The Commonwealth of Pennsylvania appeals the order of the Court of Common Pleas of Philadelphia County which granted Appellee Steven Miller's petition pursuant to the Post-Conviction Relief Act (PCRA)[1] and awarded Appellee a new trial. Appellee filed a cross-appeal, arguing that the PCRA

---

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

court erred in denying four of the remaining claims in his petition. We vacate

the PCRA court's order and remand for further proceedings.

The trial court summarized the evidence presented at trial as follows:

> On the afternoon of June 10, 2013, [Appellee] arrived at the home of Randy Coleman at roughly 1:30 p.m. for a cookout. During the festivities, [Appellee] saw Aleeya McFadden, a friend of roughly two years. Ms. McFadden arrived at the cookout with Shana Sherman. [Appellee] and Ms. Sherman had not met each other prior to that night. Around 10:00 p.m., the three individuals left the cookout and agreed to meet at PYT, a restaurant and bar located in the Piazza in the Northern Liberties section of the city; [Appellee] drove himself to the bar, and the two ladies drove to PYT in their own vehicle. En route to PYT, [Appellee] saw a friend from school, Twan (full name not given), walking; after [Appellee] told Twan of his intent to go to PYT, Twan joined [Appellee] and drove his vehicle because [Appellee] was feeling the effects of the alcoholic beverages he had consumed at the Coleman residence. At PYT, the four sat together at a table and ordered some food and a round of drinks.
>
> PYT provides mostly outdoor seating, and [Appellee's] party was seated at one of these outdoor tables in close proximity to another party of four. This other party included four individuals – Maurice Ronnie Kimble [("the victim")], Wiair Hand, Jamal Chapman and Davi Son, Mr. Chapman's girlfriend. While seated at their table, Ms. Sherman and Ms. McFadden drew the attention of several people at PYT based on their attire and because they were dancing and taking photographs and posting the photos to Instagram, a social media site. One of the photos showed Ms. Sherman sitting on [Appellee's] lap.
>
> Shortly after arriving, Ms. Sherman proceeded to use the bathroom. The bathroom at PYT is unisex, accommodating both men and women in one bathroom but offering privacy through individual stalls. [The victim] followed Ms. Sherman into the bathroom and waited until she exited her stall. At this point, [the victim] tried to talk to Ms. Sherman. After she spurned his advances, [the victim] tried to impress her with his two-thousand dollar shoes, his Gucci watch, and his wealth in general. Ms. Sherman tried to walk away, and twice, [the victim] grabbed Ms. Sherman's arm in an effort to get her phone number.

When Ms. Sherman arrived back at the table, she was visibly upset. When asked what happened in the bathroom, Ms. Sherman recounted the incident to the rest of her party. [The victim] was already seated at his table with the rest of his party. The incident was followed by an exchange of words between [the victim] and [Appellee] while each was seated at a separate table. Upon [the victim's] arrival back at his table, [the victim's] friends had already decided to pay their tab and leave for another establishment.

As [the victim's] party began to leave PYT, [the victim] kept directing comments to [Appellee] and his table. [The victim], behind the three other members of his party, eventually called [Appellee] over to talk with them. According to [Appellee], [the victim] wanted to fight [Appellee] and [Appellee] responded by lifting up his shirt and exposing a weapon and remarked to [the victim] that he could not fight [the victim] because he had a weapon on him; at this point, Mr. Hand began to run away from [the victim] and [Appellee].

According to [Appellee], he then turned and began to walk back to his table. According to [Appellee], [the victim] asked [Appellee] why he was leaving. [Appellee] testified that he heard [the victim] say he was not scared of guns; [Appellee] turned and saw [the victim] with his shirt raised, exposing a gun; he testified that he saw [the victim] reaching for the gun. In response, [Appellee] pulled out his gun and fired four shots, two of which hit [the victim] and eventually killed him. At that point, [Appellee] fled the scene and discarded the gun in a sewer grate.

Several workers and patrons immediately grabbed towels and tried to tend to [the victim's] wounds. No gun was found on or within the immediate vicinity of the [victim]. One member of [the victim's] party – Mr. Wiair Hand – did discard a firearm in a dog park some distance away. It was recovered by police.

Several witnesses testified regarding what they had seen. Ellen Clenney was the waitress attending to [Appellee's] party. Ms. Clenney was serving [Appellee's] party for roughly a half hour before the shooting occurred. Ms. Clenney stated that she saw the shooting and that the [victim] did not have a gun. Ms. Clenney testified that she saw [Appellee] follow [the victim], say something to [the victim], and, after words were passed between both men, shoot him. Ms. Clenney testified that the shooting occurred between a breezeway and that she was roughly four (4)

feet away at the time. Prior to giving her statement to homicide detectives, detectives showed Ms. Cheney [sic] the photos which had been published on Instagram. They showed [Appellee] and Ms. Sherman together. She recognized [Appellee] as the shooter.

Each member of [the victim's] party testified. Davi Son stated that when one of the ladies, later identified as Ms. Sherman, left to go to the bathroom, [the victim] followed her. When Ms. Sherman returned to [Appellee's] table and [the victim] returned to his, Ms. Son described the attitude of [Appellee's] table as agitated with gesturing toward [the victim's] table. Jamil Chapman, Ms. Son['s] boyfriend at the time, asked [the victim] what he had said to Ms. Sherman. [The victim] chuckled, but did not describe what happened. Mr. Chapman and Wiair Hand also confirmed these events when they testified.

Ms. Son told Mr. Chapman to pay the bill, because she wanted to leave. Ms. Son started to walk to her vehicle, but before she reached her car, she turned around to walk back to PYT to see why the rest of the party was delayed. As Ms. Son was walking back, she heard four or five gunshots and saw [the victim] fall to the ground. Prior to the gunshots, Ms. Son saw [the victim] with his arms raised above his head in a Y-shape.

Mr. Hand testified that prior to going to PYT, he, Ms. Son and Mr. Chapman were at Mr. Chapman's apartment located in an adjoining apartment complex to PYT. When these three knew that [the victim] had arrived, they proceeded to meet him at PYT. As they were walking downstairs, Mr. Chapman gave Mr. Hand a gun to hold for "protection."

After the party had ordered their food and drinks, Mr. Hand stated that [the victim] followed Ms. Sherman to the bathroom. After [the victim] returned, Mr. Hand estimated that the [victim's] party remained at the table for roughly five or ten minutes before leaving PYT. When [the victim] returned from the bathroom, Mr. Hand stated that members of [Appellee's] party kept staring at them. When the [victim's] party left, Mr. Hand stated that Ms. Son left through the breezeway first, followed by Mr. Chapman, Mr. Hand and [the victim], who was walking slowly and arguing with [Appellee]. Mr. Hand stated that [the victim] asked [Appellee] to step outside. Mr. Hand saw [Appellee] lift up his shirt and expose a weapon. Mr. Hand's visceral reaction was to run into the lobby of the apartment complex. After Mr. Hand heard several shots, he came from the lobby and saw [the victim]

lying on the ground. Mr. Hand then realized that he was still in possession of the weapon that Mr. Chapman had previously given him; he ran across the street to hide the gun under some weeds. Mr. Hand disclosed that, prior to testifying, he had pled guilty to a violation of the Uniform Firearms Act and was expecting a sentence of two years of reporting probation.

During cross-examination, [Appellee] questioned Mr. Hand's actions immediately prior to the fight. Although Mr. Hand testified the he had been given the gun for protection, [Appellee] questioned why the group needed protection. Mr. Hand testified that the group was going out later, but denied that the future events had anything to do with potential drug deals. [Appellee] questioned why Mr. Hand, as the protector of the group, ran when he saw the gun exposed. Mr. Hand denied being the "protector." Mr. Hand, standing roughly ten yards away, stated unequivocally that [the victim] did not have a gun and never lifted up his shirt.

Ms. Sherman also testified and recounted the bathroom incident. Ms. Sherman stated that after the bathroom incident but before the [victim's] party left, words were being exchanged between [the victim] and [Appellee]. When the [victim's] party left, Ms. Sherman saw [Appellee] follow [the victim]; the second round of arguments then began. Ms. Sherman was standing near the table and looking directly at [the victim] and could only see [Appellee's] back. Ms. Sherman saw [Appellee] lift his shirt and shoot [the victim] twice while standing and twice more when [the victim] had fallen to the ground. Sherman never saw [the victim] lift his shirt or expose a weapon, either during the altercation or in the bathroom.

Mr. Chapman testified that once [Appellee] raised his shirt to expose his weapon, Mr. Hand began to run. Mr. Chapman stated that when [Appellee] started withdrawing the weapon, [Mr. Chapman] also began to flee. Mr. Chapman hid in the stairwell to an adjoining apartment complex. Mr. Chapman also testified that [the victim] did not have a weapon.

Brody Smythe was the server who attended to [the victim's] party. Prior to the shooting, Mr. Smythe dropped the bill on their table and waited until they paid. When the [victim's] party paid, they got up and walked out. Mr. Smythe then stated that [Appellee] got up and ran after them to the breezeway. Mr. Smythe saw Ms. McFadden screaming while chasing after [Appellee]. Mr. Smythe was roughly ten (10) feet away from the

location in the breezeway where the shooting occurred and was certain that he saw only one gun that night.

Michael Lasday was a patron at PYT and was seated near the breezeway. When Mr. Lasday heard some shouting and two shots being fired, he turned and saw [the victim] on the ground. Mr. Lasday stated that [Appellee] then fired two more shots with his arm extended toward [the victim] in a downward angle. After the shooting, Ms. Clenney told Mr. Lasday about the two ladies at [Appellee's] table and that they had taken pictures before the shooting. Mr. Lasday found the Instagram photos that were posted and informed the officers who responded to the scene. Mr. Lasday did not see a gun on or near the decedent and did not see anyone run up to the decedent and remove a gun.

Ms. McFadden testified for the defense. In almost all respects, Ms. McFadden testified in a fashion consistent with the other witnesses regarding the incidents leading up to the last altercation. Notably, Ms. McFadden testified that once the altercation occurred in the breezeway, [Appellee] lifted his shirt, [the victim] lifted his shirt and exposed what she believed to be a gun, and that [Appellee] shot [the victim]. During cross-examination, Ms. McFadden was impeached with the fact that she had explicitly told detectives, during a formal interview, that [the victim] never had a gun.

* * *

[Appellee] also presented John Waters, who testified that he was in the living room of his apartment located on the sixth floor when he heard gunshots. Thirty-five to forty seconds after hearing the shots, Mr. Waters went to the balcony of his apartment which looked over the street where the shooting occurred. Mr. Waters could see a man wearing a pink shirt running away from PYT followed by another person running in a different direction toward a dog park located near Germantown Avenue and Hancock Street. Mr. Waters testified that the second man ran to the dog park, bent over, and "did something in the woodchips and soil along the fence line."

[Appellee] also presented nine character witnesses. All of the witnesses testified that [Appellee's] character in the community for being a peaceful and law-abiding citizen is good.

[Appellee] also testified. [Appellee] stated that, in May of 2009, he had just cashed a paycheck at a bank and was later standing in front of a sneaker store when a couple of individuals

- 6 -

approached him and asked him a question. One of the individuals lifted up his shirt, pulled out a gun and shot [Appellee] as he tried to run away. After seven months of recuperating, [Appellee] proceeded to [illegally] buy a .40 caliber Smith & Wesson to protect himself because the incident caused him to be "very paranoid."

[Appellee] also described the events that transpired after Ms. Sherman returned from the bathroom. Once Ms. Sherman came back from the bathroom, [Appellee] described Ms. Sherman as appearing frustrated. [Appellee] testified that his friend, Twan, asked Ms. Sherman if anything was wrong. Ms. Sherman described the incident and pointed toward [the victim] as the person who had confronted her in the bathroom.

[Appellee] testified that [the victim] made a comment which precipitated an exchange of words. As the [victim's] party began to depart, [the victim] twice called out to [Appellee] to "come here." After the second request by [the victim], [Appellee] proceeded to leave his seat and approach [the victim]. When [Appellee] reached [the victim], [the victim] told [Appellee] that he wanted to fight. [Appellee] lifted up his shirt and told [the victim] that he could not fight him because of the gun he had. [Appellee] heard Mr. Hand scream and run when he exposed the gun to [the victim]. [Appellee] proceeded to turn around to go back to his table when he heard [the victim] say, "Yo, where you going? I ain't running ... [.][W]e ain't worried about no guns. I'm not scared of no guns. We got guns too."

According to [Appellee], he then turned, saw [the victim] lift his shirt and reach for a gun. [Appellee] stated that he reacted to the movements by [the victim] by shooting him. According to [Appellee], the first two shots were fired while he was facing [the victim] and the second set of shots were fired while [Appellee] was running away. [Appellee] stated that he then discarded the weapon in a sewer grate and made plans with Greyhound to flee the jurisdiction. [Appellee] took a bus to Los Angeles, California and, after a week and a half, left for Houston, Texas, where he was apprehended by police.

During cross-examination, [Appellee] was asked about his connection to Ms. McFadden. [Appellee] testified that the father of Ms. McFadden's child, Quan Harper, was a very good friend of his prior to Mr. Harper's murder in 2009. [Appellee] was asked if the 2009 shooting where he portrayed himself as a victim of a

random crime was actually an act of retaliation on his part against the people who had killed his friend. [Appellee] denied that his 2009 shooting was a crime of retaliation. [Appellee] was asked if he knew anything about the Harper Family Gang. [Appellee] denied knowing anything about the Harper Family Gang.

Trial Court Opinion (T.C.O.), 10/31/14, at 3-12 (citations and footnote omitted, paragraph spacing added).

On October 28, 2013, a jury convicted Appellee of third-degree murder, possessing an instrument of crime, carrying a firearm without a license, and carrying a firearm on the public streets of Philadelphia. On January 16, 2014, the trial court sentenced Appellee to an aggregate term of 23½ to 47 years' imprisonment. On January 24, 2014, Appellee filed a post-sentence motion, which was denied by operation of law on May 28, 2014.

On August 5, 2015, this Court affirmed the judgment of sentence and on February 1, 2016, our Supreme Court denied Appellee's petition for allowance of appeal. *See Commonwealth v. Miller*, 494 EAL 2015 (Pa. February 1, 2016); *Commonwealth v. Miller*, 1626 EDA 2014 (Pa.Super. August 5, 2015) (unpublished memorandum).

On December 20, 2016, Appellee filed a timely PCRA petition. On December 22, 2017, Appellee filed an amended petition, raising *inter alia*, a claim of "new evidence of actual innocence," based on a statement allegedly made by Gary Silver, Esq., the attorney who represented prosecution witness

Wiari Hand against charges for the illegal possession of a firearm on the night of the murder. Amended PCRA Petition, 12/22/17, at 13.[2]

On May 10, 2018, the PCRA court held a hearing at which Samuel Stretton, Esq. ("trial counsel") testified concerning an alleged conversation he had with Attorney Silver during Appellee's trial. According to trial counsel, Attorney Silver indicated that his client, Hand, lied when he testified at Appellee's trial that he was in possession of Chapman's handgun before the shooting and that the victim was unarmed when he was shot.

Instead, trial counsel testified that Attorney Silver shared that Hand actually possessed *the victim's* handgun. However, at the PCRA hearing, trial counsel became confused when initially reporting this statement. Trial counsel stated that "Mr. Silver told me that his client[, (Wiari Hand),] had misled the court and that it was his gun. The client, Mr. Hand's gun. Sorry, it was the decedent's gun. Not Mr. Hand's gun. Sorry." Notes of Testimony (N.T.), PCRA Hearing, 5/10/18, at 43-44. Trial counsel indicated that Attorney Silver shared that Hand had admitted that he moved the handgun from the victim's body after Appellee shot the victim and disposed of the firearm in some weeds to make it look like the victim was unarmed at the time of the shooting.

Acknowledging that he had become confused on Hand's alleged statement to Attorney Silver, trial counsel explained that he has litigated almost 1,000 cases since Appellee's trial and he does not remember names

---

[2] The Commonwealth did not challenge the PCRA court's decision to allow Appellee to amend his petition.

well. Trial counsel candidly admitted that he would get names "mixed up in [his] head sometimes" and conceded that there was a possibility that his cases could "get conflated over the years." *Id*. at 16, 44-45.

At the time of Appellee's trial, trial counsel believed he was bound by attorney-client privilege to keep Attorney Silver's statement confidential, as trial counsel had served as Attorney Silver's counsel in an unrelated matter years before this case. However, trial counsel revealed Attorney Silver's communication to assist Appellee in seeking collateral relief as he now takes a "different position" on this ethical question. *Id*. at 43-44, 79-80, 113.

Appellee presented the testimony of Attorney Silver, who denied telling trial counsel that Hand picked up the victim's firearm and disposed of it after the shooting. Attorney Silver adamantly claimed he did not make this statement, indicating "I would remember that." *Id*. at 109-10.

In his PCRA petition, Appellee claimed trial counsel was not bound by the attorney-client privilege and could have used Attorney Silver's statement to show that a witness had committed perjury at Appellee's murder trial. As noted above, Appellee characterized his claim in terms of "new evidence" that could be presented at a new trial and did not claim trial counsel was ineffective in failing to reveal this testimony.

Appellee's PCRA counsel indicated that she had intended to call Wiair Hand as a witness at the evidentiary hearing but she had difficulty locating him even after hiring a private investigator. Although PCRA counsel never found Hand's address, she noted that she was able to reach him on a phone

number provided by Attorney Silver. Hand told PCRA counsel that he did "not wish to be involved." *Id*. at 4-5.

On December 7, 2018, the PCRA court judge, the Honorable Steven Geroff, briefly concluded that Appellee was entitled to a new trial on the basis of his finding that trial counsel was "ineffective." However, Judge Geroff expressed reluctance to explain his rationale for this ruling. After the prosecutor pressed Judge Geroff to put his reasoning on the record as the Commonwealth wished to appeal, Judge Geroff stated:

> Very good. Then take the appeal. I'm a big boy. I can handle it. I don't mind. Lawyers who appeal, do their job, you know.
>
> I think that the trial counsel was caught in an ethical conflict because of his representation years before of the attorney who represented Wiair Hand. And the information that the attorney relayed to trial counsel during the course of trial concerning his opinion that Mr. Hand had lied. And I think trial counsel owed him an obligation, an ethical obligation, to [Appellee] in this case, to have used that to his advantage. Instead, he chose not to.

N.T., PCRA Hearing, 12/7/18, at 5.

Thereafter, the prosecutor asked if Judge Geroff was making specific findings that trial counsel was credible and that Attorney Silver had lied to the PCRA court. Judge Geroff responded as follows:

> I'm not accusing [Attorney Silver] of lying. I'm not accusing him of lying. But my finding is that I chose – that when [trial counsel] explained what happened, I believed his testimony. I believe, at that point, he had – when all of that had developed at the trial, he had an obligation to the client he was representing in a homicide case; that was more important than the obligation he had to his former client, Mr. Silver.

*Id*. at 5-6.

- 11 -

After finding Appellee was entitled to a new trial due to trial counsel's ineffectiveness, Judge Geroff then denied the remaining issues in Appellee's petitions, stating that "if all I had to decide were the other issues in the case, I would have denied the petition." *Id*. at 3-4. Judge Geroff did not make any factual findings or provide any rationale in denying these claims.

On December 11, 2018, the Commonwealth filed a timely appeal. On December 22, 2018, Appellee filed a timely cross-appeal. Both parties complied with the PCRA court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). As Judge Geroff did not file a responsive 1925(a) opinion due to his subsequent retirement, the case was reassigned to the Honorable Genece E. Brinkley.

On February 26, 2019, Judge Brinkley filed an order recusing herself from this case. On March 5, 2019, the matter was again reassigned to Judge Brinkley by the supervising judge. On March 29, 2019, Judge Brinkley filed an order stating that "this Court cannot write an Opinion in support of the decision of Judge Geroff due to a plethora of ethical issues raised by his decision, and because it appears that Judge Geroff did not address the merits of the case based upon relevant case law." Order, 3/29/19, at 1 (footnote omitted).

On appeal, the Commonwealth asks this Court to review "[w]hether the lower court erred in granting [Appellee] a new trial where he failed to meet his burden that counsel was ineffective." Commonwealth's Brief, at 1. In his cross-appeal, Appellee raises the following issues for review:

I.    Whether [Appellee] was denied effective assistance of counsel arising from a failure to investigate and find Anthony Bright?

II.   Whether [Appellee] was denied effective assistance of counsel arising from the failure to investigate and find [the victim's] criminal record?

III.  Whether [Appellee] was denied effective assistance of counsel arising from the failure to investigate viewed cumulatively?

IV.   Whether [Appellee] was denied due process when the Commonwealth failed to correct the false testimony of Wiair Hand?

Appellee's Brief, at 15-16.

Our standard of review is well-established:

> [o]ur review of the grant or denial of PCRA relief is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. **Commonwealth v. Cox**, 636 Pa. 603, 146 A.3d 221, 226 n.9 (2016). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. **Commonwealth v. Burton**, 638 Pa. 687, 158 A.3d 618, 627 n.13 (2017).

**Commonwealth v. Small**, 647 Pa. 423, 440–41, 189 A.3d 961, 971 (2018).

As stated above, the Commonwealth claims the PCRA court erred in granting Appellee a new trial based on its finding that trial counsel was ineffective. Our review of this claim is guided by the following principles:

> [a]s originally established by the United States Supreme Court in **Strickland v. Washington**, 466 U.S. 668, [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), and adopted by Pennsylvania appellate courts, counsel is presumed to have provided effective representation unless a PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to

> effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error.
>
> *Commonwealth v. Wantz*, 84 A.3d 324, 331 (Pa.Super. 2014) (citations omitted). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." *Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009).

*Commonwealth v. Selenski*, ___A.3d___, 1062 EDA 2019, 2019 WL 544091, at *4 (Pa.Super. Feb. 4, 2020).

As an initial matter, we point out that in Appellee's Amended PCRA petition, Appellee never asserted that trial counsel was ineffective, but instead characterized his argument as raising "new evidence of actual innocence." Amended PCRA Petition, 12/22/17, at 13. Appellee's failure to include this specific ineffectiveness challenge in his PCRA petition precluded him from obtaining relief on that basis.

Pennsylvania Rule of Criminal Procedure 902, which governs the content of PCRA petitions, specifically provides that "[e]ach ground relied upon in support of the relief requested shall be stated in the petition. Failure to state such a ground in the petition shall preclude the defendant from raising that ground in any proceeding for post-conviction collateral relief." Pa.R.Crim.P. 902(b).

Moreover, it is well-established that a petitioner bears the burden of proving counsel's ineffectiveness through the three-part ineffectiveness test. *Commonwealth v. Wholaver*, 644 Pa. 386, 401, 177 A.3d 136, 144 (2018) (quoting *Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655, 664

(2007)).  The PCRA expressly requires that a petitioner "plead and prove" by a preponderance of the evidence each element of his ineffectiveness claim. 42 Pa.C.S.A. § 9543.  As noted above, "counsel is presumed to have provided effective representation unless a PCRA petitioner *pleads and proves* all three of the prongs of the ineffectiveness test."  **Selenski**, **supra** (emphasis added).

As Appellee did not even allege that counsel was ineffective in failing to reveal the information he received from Attorney Silver, the PCRA court erred by improperly raising this ineffectiveness claim *sua sponte* on Appellee's behalf and concluding that Appellee was entitled to a new trial based on a specific claim Appellee never raised.

Even assuming that Appellee had properly sought to plead and prove this particular allegation of ineffectiveness, the PCRA court did not evaluate counsel's representation pursuant to applicable precedential law using the three-prong ineffectiveness test.  Typically, when a PCRA court makes legal conclusions expressly premised on incomplete factual findings, our courts will remand for the PCRA court to make necessary credibility determinations, factual findings, and to assess **Strickland** prejudice in light of those findings. **Commonwealth v. Johnson**, 600 Pa. 329, 359, 966 A.2d 523, 540–41 (2009).  We cannot remand for Judge Geroff to make specific fact findings and credibility determinations and provide further explanation of his ruling on this issue, as he has since retired from the bench.

Nevertheless, there is no support in the record for the PCRA court's conclusion that trial counsel was ineffective in failing to "use" Attorney Silver's

- 15 -

statement to the "advantage" of his client, Appellee, in his murder trial. While the PCRA court suggested trial counsel was ineffective in failing to call Attorney Silver to testify at Appellee's trial, we note the following:

> [t]o satisfy the prejudice prong of this test when raising a claim of ineffectiveness for the failure to call a potential witness at trial, our Supreme Court has instructed that the PCRA petitioner must establish that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew, or should have known, of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. *Commonwealth v. Sneed*, 616 Pa. 1, 22–23, 45 A.3d 1096, 1108–109 (2012) (citing *Commonwealth v. Johnson*, 600 Pa. 329, 351, 966 A.2d 523, 536 (2009) and *Commonwealth v. Clark*, 599 Pa. 204, 222, 961 A.2d 80, 90 (2008)).

*Commonwealth v. Wantz*, 84 A.3d 324, 331 (Pa.Super. 2014).

The record supports an inference that Attorney Silver would not have been willing to cooperate and testify for the defense as he adamantly and unequivocally denied that he told trial counsel that his client, Hand, had committed perjury at Appellee's trial. Even trial counsel acknowledged that it was not logical for Attorney Silver to reveal his client's confidences and noted Attorney Silver would be subject to discipline for an ethical violation.

In addition, trial counsel's report of Attorney Silver's alleged statement did not establish an evidentiary basis on which to grant a new trial. While the PCRA court suggested trial counsel was ineffective in failing to recognize that he had an ethical obligation to "use" Attorney Silver's revelation to Appellee's "advantage" at Appellee's murder trial, the PCRA court failed to explain how

counsel could do so. Even if Attorney Silver was willing to testify for the defense, trial counsel could not ask Attorney Silver to testify to Hand's out-of-court statement (which would constitute inadmissible hearsay), could not admit Hand's prior inconsistent statement to Attorney Silver as substantive evidence, and would be limited to using the statement to impeach Hand.[3]

Moreover, the PCRA court failed to analyze the testimony in light of the fact that Appellee was required to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Strickland**, 466 U.S. at 694, 104 S.Ct. 2052. The PCRA court did not address this prong of the ineffectiveness test in light of the overwhelming evidence of Appellee's guilt in that multiple witnesses (even a defense witness) testified that the victim was unarmed when Appellee shot and killed him.

---

[3] Our Supreme Court has explained that:

> In an effort to ensure that only those hearsay declarations that are demonstrably reliable and trustworthy are considered as substantive evidence, we now hold that a prior inconsistent statement may be used as substantive evidence only when the statement is given under oath at a formal legal proceeding; or the statement had been reduced to a writing signed and adopted by the witness; or a statement that is a contemporaneous verbatim recording of the witness's statements.

**Commonwealth v. Lively**, 530 Pa. 464, 471, 610 A.2d 7, 10 (1992).

Accordingly, we find the PCRA court's findings were not supported by the record and its determination that Appellee met the burden to plead and prove the aforementioned ineffectiveness claim was legal error.[4] As such, we conclude the PCRA court erred in granting Appellee a new trial.

Turning to Appellee's cross-appeal, Appellee contends that the PCRA court erred in denying four of the remaining claims in his PCRA petition. As noted above, the PCRA court failed to make any factual findings or set forth any supporting analysis for its conclusion that Appellee was not entitled to relief on these claims.

Our courts will remand in such circumstances as "[a] developed post-conviction record accompanied by specific factual findings and legal conclusions is an essential tool necessary to sharpen the issues so that differences at the appellate level can be mitigated." *Johnson*, 600 Pa. at 359, 966 A.2d at 540–41.

---

[4] We cannot affirm the PCRA court's decision on alternative grounds based on Appellee's original assertion that he had presented "new evidence" of his innocence. To successfully claim that a new trial is warranted based on after-discovered evidence, a petitioner must show that "(1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict." *Commonwealth v. Diggs*, 220 A.3d 1112, 1117 (Pa.Super. 2019) (quoting *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586 (2007)). It is undisputed that Appellee could not meet the first prong of this test in showing the evidence was discovered after trial as Appellee's counsel admitted his conversation with Attorney Silver occurred during trial. In addition, the trial court did not analyze whether the evidence would have been used solely to impeach Hand's credibility or if the evidence would likely compel a different verdict.

For the foregoing reasons, as Appellee failed to meet the requisite burden to plead and prove the aforementioned ineffectiveness claim, we conclude that the PCRA court erred in granting Appellee's petition and awarding him a new trial. We remand for the PCRA court to review the four claims raised in Appellee's cross-appeal that were not fully evaluated by Judge Geroff.

Order granting Appellee a new trial vacated. Remanded to the PCRA court for further proceedings consistent with this decision. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/17/20